1               IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

2

3  UNITED STATES OF AMERICA     )   CASE NO. 1:13CR339-1
                         )

4         vs.            )
                         )   Greensboro, North Carolina

5  VENDAI LAPRIEST IRICK       )   April 17, 2014
  _____   9:41 A.M.

6

7

8               TRANSCRIPT OF THE **SENTENCING HEARING**
         BEFORE THE HONORABLE N. CARLTON TILLEY, JR.

9              UNITED STATES DISTRICT JUDGE

10

11  <u>APPEARANCES:</u>

12  For the Government:      KYLE D. POUSSON, AUSA
                     Office of the U.S. Attorney

13                     101 S. Edgeworth Street, 4th Floor
                     Greensboro, North Carolina 27401

14

15  For the Defendant:       GREGORY DAVIS, AFPD
                     Office of the Federal Public Defender

16                     251 N. Main Street, Suite 849
                     Winston Salem, North Carolina 27101

17

18  Court Reporter:         BRIANA NESBIT, RPR
                     Official Court Reporter

19                     P.O. Box 20991
                     Winston-Salem, North Carolina 27120

20

21

22

23

24       Proceedings recorded by mechanical stenotype reporter.

25     Transcript produced by computer-aided transcription.

```
 1                        INDEX

 2

 3   GOVERNMENT'S WITNESSES:                        PAGE:

 4

 5   DETECTIVE JIM YOUNG:

 6       Direct Examination by Mr. Pousson             9
         Cross-Examination by Mr. Davis              17
 7       Cross-Examination by Mr. Shoaf              22
         Cross-Examination by Mr. Huggins            23
 8

 9   DEFENDANTS' WITNESSES:                         PAGE:

10   RODNEY BYRD:

11       Direct Examination by Mr. Shoaf            31
         Cross-Examination by Mr. Pousson          37
12

13   PRUDENCE C. SHIVERS:

14       Direct Examination by Mr. Huggins         39

15

16

17

18

19

20

21

22

23

24

25
```

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

P R O C E E D I N G S

(The Defendants were present.)

**MR. POUSSON:**  Good morning, Your Honor.  Your Honor, we have three sentencings on the calendar for this morning. It's United States versus Vendai Irick, Denzel Shivers, and Rodney Byrd.  This is 1:13CR339-1, 2, and 3.  I believe this is a continuation of a sentencing hearing from earlier this year.

I see Mr. Shoaf present.  I see Mr. Huggins present.  I believe Mr. Davis might be in another courtroom.

**THE COURT:**  Why don't we take a short break and wait for Mr. Davis so we can do all of these at the same time since they involve the same facts with regard to the offense.

**MR. POUSSON:**  Thank you, Your Honor.

**THE COURT:**  We'll just stand in a recess.

(The Court recessed at 9:42 a.m. and was called back to order at 9:54 a.m.)

(The Defendants were present.)

**THE COURT:**  Mr. Pousson?

**MR. POUSSON:**  Thank you, Your Honor.  Your Honor, if it please the Court, if we could return to the matter of 13CR339-1, 2, and 3, United States versus Rodney Byrd, Denzel Shivers, and Mr. Vendai Irick.  All three are present.  All three are represented by counsel.  This matter is calendered for a continuation of a sentencing hearing.

**MR. DAVIS:**  Good morning, Your Honor.

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

```
 1          THE COURT:  Good morning, Mr. Davis.  Everybody ready
 2  to proceed with sentencing?
 3          MR. DAVIS:  We are, Your Honor.
 4          MR. HUGGINS:  Yes, Your Honor.
 5          MR. SHOAF:  We are, Your Honor.
 6          THE COURT:  Mr. Davis, you are here with Mr. Irick?
 7          MR. DAVIS:  Yes, sir.
 8          THE COURT:  Talk to me about any objections to the
 9  presentence report.
10          MR. DAVIS:  Your Honor, when we were last in Court, I
11  had filed an objection regarding the amount of loss, but that
12  was resolved; and that was the only objection that we had
13  raised.
14          THE COURT:  Okay.  And today, Mr. Irick, you are in
15  agreement with that?
16          DEFENDANT IRICK:  Yes, sir.
17          THE COURT:  Thank you.
18     Mr. Shoaf -- Mr. Byrd, you've read your presentence
19  report?
20          DEFENDANT BYRD:  Yes, sir.
21          THE COURT:  If you would stand, please.  You've
22  discussed your presentence report with Mr. Shoaf?
23          DEFENDANT BYRD:  Yes, sir.  I was going over a little
24  something else on the presentencing report about my criminal
25  history, and I was asking him a quick question.
```

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1          **THE COURT:**  Okay.  You certainly may do that.  You

2   all should have done that before now.

3          **MR. SHOAF:**  We have, Your Honor.  This is the first

4   time he's raised this.

5          **THE COURT:**  Well, you all sit down and talk about it.

6   In fact, we'll just take a recess, and you let us know when you

7   are ready.

8      (The Court recessed at 9:56 a.m. and was called back to

9      order at 10:00 a.m.)

10     (The Defendants were present.)

11         **THE COURT:**  Mr. Shoaf?

12         **MR. SHOAF:**  Your Honor, we talked and he understands.

13   He is a Record Level III for sentencing purposes.

14         **THE COURT:**  Are there objections?

15         **DEFENDANT BYRD:**  No, sir.

16         **THE COURT:**  Mr. Huggins?

17         **MR. HUGGINS:**  Good morning, Your Honor.

18         **THE COURT:**  Good morning.  Mr. Shivers, you talked

19   about your presentence report?

20         **DEFENDANT SHIVERS:**  Yes, sir.

21         **THE COURT:**  And with regard to objections, are there

22   objections?

23         **DEFENDANT SHIVERS:**  No, sir.

24         **MR. HUGGINS:**  No, Your Honor.

25         **THE COURT:**  Okay.  Then in Mr. Shivers' case and in

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1  Mr. Irick's case -- in fact, in each of these cases, I will

2  adopt -- you may be seated -- I will adopt the presentence

3  report with regard to the facts stated there and the

4  application of the guidelines to those facts.

5      In Mr. Shivers' and Mr. Irick's case, the total offense

6  level is a 32.  Criminal history category is a I.  The advisory

7  imprisonment range is 121 to 151 months.  Supervised release

8  range is 1 to 3 years.  The fine range is 75,000 to 175,000,

9  and there is a 100-dollar special assessment.

10     Now, in Mr. Byrd's case, because he is a criminal history

11 category of III and total offense level of 32, the advisory

12 guideline range is 151 to 188 months with a period of

13 supervised release of 1 to 3 years.  The fine range is 17,500

14 to 175,000 and the special assessment is $100.

15     Mr. Davis, will there be evidence on Mr. Irick's behalf?

16          **MR. POUSSON:**  No, Your Honor.

17          **THE COURT:**  Mr. Shoaf, will there be evidence on

18 Mr. Byrd's behalf?

19          **MR. SHOAF:**  No, Your Honor.

20          **THE COURT:**  Will there be evidence on Mr. Shivers'

21 behalf?

22          **MR. HUGGINS:**  No, Your Honor.

23          **THE COURT:**  Mr. Pousson, does the government have

24 additional evidence?

25          **MR. DAVIS:**  No, not at this time, Your Honor.

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1      **THE COURT:**  Now, when you say "not at this time," are

2  you suggesting that you may have evidence?

3      **MR. POUSSON:**  No, Your Honor, not as to this case.

4  My only hesitation is that, as you know, I was not here for the

5  previous hearing.  My understanding was that the Court had

6  inquired about other matters -- details about other matters in

7  the presentence report.

8      **THE COURT:**  That's correct.

9      **MR. POUSSON:**  I have a witness here that might answer

10  any of those questions, if the Court still has them, but I

11  would not ask to put him on unless the Court still has those

12  questions.

13      **THE COURT:**  Oh, I do.  I have very strong questions

14  about that.  I'm not sure one witness is sufficient.

15      **MR. POUSSON:**  Yes, Your Honor.  We have brought in

16  the detective from Cary who was the lead detective for all of

17  the Cary matters that are referenced in the PSR.  If the Court

18  has questions about those, I would be happy to call him and put

19  some evidence on the record as to those incidents; but as to

20  facts of this incident in Durham, I have no additional evidence

21  to offer.

22      **THE COURT:**  Okay.  I really was anticipating evidence

23  from witnesses of that.

24      **MR. POUSSON:**  My apologies, Your Honor.  I assumed

25  that the detective would be sufficient to provide an overview.

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1  I didn't realize that the Court wished to go into detail with

2  each of those individuals.

3          **THE COURT:**  That's a very important part of where we

4  are in this matter, and --

5          **MR. POUSSON:**  Yes, Your Honor.

6          **THE COURT:**  -- it has a lot to do with considerations

7  for these three defendants and what should be done, and I am

8  sure none of them are going to say that they participated in

9  that.  So it is a question of the government proving by a

10 preponderance of the evidence --

11         **MR. POUSSON:**  Yes, Your Honor.

12         **THE COURT:**  -- what did take place there, if there

13 was an offense that took place there.

14         **MR. POUSSON:**  Yes, Your Honor.

15         **THE COURT:**  Do you need a few minutes?

16         **MR. POUSSON:**  If I could, Your Honor?  I'm sorry.  I

17 am trying to determine how to proceed.  I believe the detective

18 here could testify as to all of the evidence that would tie

19 these defendants to those incidents.  He would not, however, be

20 able to provide the -- he would not be able to testify as the

21 victims themselves.

22         **THE COURT:**  Unless there were statements, admissions.

23         **MR. POUSSON:**  That would be --

24         **THE COURT:**  Then that's not going to be sufficient.

25         **MR. POUSSON:**  Yes, Your Honor.  It's my understanding

1  that all of the evidence tying these -- or most the evidence

2  tying these individuals to those offenses were statements that

3  they made when they were arrested for this incident.

4              **THE COURT:**  Well, then that may be sufficient.

5              **MR. POUSSON:**  Yes, Your Honor.

6              **THE COURT:**  And you may proceed.

7              **MR. POUSSON:**  Thank you, Your Honor.  The government

8  would ask to call Detective Jim Young to the stand.

9  **DETECTIVE JIM YOUNG,** GOVERNMENT'S WITNESS, at 10:06 a.m., being

10 first duly sworn, testified as follows:

11                         DIRECT EXAMINATION

12 **BY MR. POUSSON**

13 Q    Good morning, sir.  Once you get settled, if you could

14 please state and spell your name for the Court.

15 A    My name is Jim, J-I-M, Young, Y-O-U-N-G.

16 Q    And how are you employed, sir?

17 A    I'm a detective with the Cary Police Department.

18 Q    How long have you been a member of law enforcement?

19 A    Approximately 18 years.

20 Q    As part of your duties, did you have occasion to

21 participate in an investigation of several robberies in Cary

22 that occurred on 6/2, 3/2 and 6/17 of last year?

23 A    Yes, sir, I did.

24 Q    And what was your role in these investigations?

25 A    I was assigned as the primary detective regarding these

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1  incidents.

2  Q    And as part of that investigation, did you become familiar

3  with an incident that occurred at Jared's Galleria of Jewelry

4  in Durham?

5  A    Yes, sir.

6  Q    Did you have any participation in that investigation?

7  A    Yes, sir, I did.

8  Q    And what was your -- what was the nature of your

9  involvement in that investigation?

10  A    Yes, sir.  I was on duty at the time the individuals

11  identified as being responsible for the incident in Durham at

12  Jared's -- they were involved in a traffic collision,

13  single-car traffic collision in Cary.  I responded out to that

14  location and quickly noted evidence within the vehicle -- or a

15  vehicle that appeared tied directly to at least one or two of

16  the incidents in Cary.

17  Q    With relation to the previous incidents in Cary, were you

18  involved in an investigation of an incident on 6/2 of 2013?

19  A    Yes, sir, I was.

20  Q    And what was the nature of that incident?

21  A    That was an armed robbery at the McDonald's restaurant at

22  869 Southeast Maynard Road in Cary.

23  Q    How many suspects were identified in that incident?

24  A    Two black male individuals.

25  Q    And were any weapons reported in that incident?

Case 1:13-cr-00339-NCT   Document 68   Filed 07/07/14   Page 10 of 71

1  A    Yes, sir.  They were armed with handguns.

2  Q    During the course of that investigation, did law

3  enforcement have occasion to interact with a Rodney Byrd?

4  A    Yes, sir.

5  Q    And why was it that they came into contact with him?

6  A    Mr. Byrd was an employee that was working within the

7  McDonald's at the time that the armed robbery incident took

8  place.

9  Q    As part of that investigation, was surveillance video --

10  was there -- did officers check to see if there was

11  surveillance video in the McDonald's?

12  A    Yes, sir, the business was able to provide us with

13  surveillance video footage.

14  Q    Did you review that footage?

15  A    Yes, sir, I did.

16  Q    Could you describe the two suspects from that -- that you

17  observed on that footage?

18  A    Yes, sir.  One of the males entered, had on a light what I

19  would describe as a powder blue hooded sweatshirt with orange

20  gloves and was armed with a handgun.  The second individual I

21  believe was a taller individual and -- give me one moment to

22  look for that information.  He had on a black hoodie that

23  appeared to have the word "TAPOUT" written on the front of it

24  in white lettering.  That individual had on black and red

25  gloves, blue jeans, black sneakers.

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1  Q    At the time that you responded to the wreck that resulted

2  from the incident at Jared's, did you make any observations in

3  that wreck that had any bearing on this robbery that you've

4  just described?

5  A    Yes, sir, I did.

6  Q    What were those observations that you made?

7  A    So within the vehicle that was involved in a

8  single-vehicle collision within Cary, I noted that there was --

9              **THE COURT:**  What type vehicle was that?

10             **THE WITNESS:**  That was a Nissan Pathfinder SUV.

11             **THE COURT:**  Okay.

12             **THE WITNESS:**  Within that vehicle, I noted at least

13 one orange glove that was visible within the passenger area

14 without the vehicle being explored, and also I noticed what

15 appeared to be a handgun or possibly a pellet gun that was in

16 the sleeve behind the driver's side seat.

17 **BY MR. POUSSON**

18 Q    Did you have occasion, as part of your investigation, to

19 request surveillance video from Jared's in relation to the

20 robbery that occurred at Jared's?

21 A    Yes, sir.

22 Q    Did you watch that video?

23 A    Yes, I watched stills from that video, some still

24 photographs.

25 Q    And did you make any observations about the individuals

1  that you observed in those photographs as relates to the

2  robbery at McDonald's that you were investigating?

3  A    Yes, sir.  I noted that one of the individuals was wearing

4  a light blue, powder blue hooded sweatshirt that was consistent

5  with the sweatshirt worn in the McDonald's video from the

6  robbery on June 3rd -- excuse me -- June 2nd.

7  Q    In addition to the June 2nd robbery, did you also have

8  occasion to investigate an incident in the Wells Fargo parking

9  lot on 6/17 of 2013?

10  A    Yes, sir, I did.

11  Q    What was the nature of that incident?

12  A    At approximately 9:45 p.m., an individual from a business

13  within Cary Towne Center was dropping off the bank deposit at

14  the night drop box at the Wells Fargo.  As he exited his

15  vehicle to unlock the night deposit box, he was approached --

16  two black males approached from a wooded area.  One was armed

17  with a handgun.  They made contact with him, removed the bank

18  bag with the deposits from his person, and fled back in the

19  wooded area.

20  Q    Were any weapons reported in that incident?

21  A    Yes, sir, at least one handgun.

22  Q    Now, as part of your investigation, did you have occasion

23  to inquire as to whether or not Mr. Vendai Irick, Rodney Byrd,

24  or Denzel Shivers made statements after they were arrested for

25  the Jared's incident?

1  A    Yes, sir.

2  Q    And did you obtain -- did you also request any information

3  as to whether or not those interviews were recorded?

4  A    Yes, sir, I did.

5  Q    And did you yourself review those interviews?

6  A    Yes, sir.

7  Q    In relation to -- during those interviews, did any of

8  those three individuals make statements related to your -- the

9  robberies that you were investigating?

10 A    Yes, sir.  Mr. Shivers provided a statement that Mr. Byrd

11 and Mr. Irick were responsible for the robbery of the

12 individual at the Wells Fargo on June 17th.  Mr. Irick advised

13 that all three individuals -- Mr. Shivers, Mr. Irick, and

14 Mr. Byrd -- were responsible for the incident that took place

15 at McDonald's on June 2nd and the incident that took place at

16 Wells Fargo on June 17th.

17 Q    In looking at the incident that occurred at Jared's, did

18 you -- were you -- at the time that that incident occurred,

19 were you -- if I could withdraw that, Your Honor?

20     In addition to these two robberies that you've just

21 described, did you also have occasion to investigate an

22 incident on Sedgemoor Drive on June 23, 2013?

23 A    Yes, sir, I did.

24 Q    And when did this incident occur with relation to the

25 robbery at Jared's Jewelry?

1  A    The incident at 106 Sedgemoor took place on Sunday

2  evening, June 23 at approximately 7:30 p.m., which would have

3  been about 26 hours prior to the incident at Jared Jewelers.

4  Q    What was the nature of the incident that was reported on

5  Sedgemoor Drive?

6  A    A female resident of 106 Sedgemoor Drive reported that she

7  had came home from The Streets at Southpoint in Durham.  She

8  arrived home, stayed at the residence for a brief period of

9  time before leaving to go to the grocery store.  When she left

10 the second time, she left her garage door open.  When she

11 returned from the grocery store, she was unloading groceries

12 from her car into the interior of the house.  Two black males

13 entered the garage.  They attempted to remove her person from

14 the garage and --

15           **THE COURT:**  Attempted to remove what?

16           **THE WITNESS:**  They attempted to take her from the

17 garage.  They attempted to physically take her with them.  They

18 made statements that she was coming with them.  That act was

19 interrupted by the female's boyfriend opening up the door

20 leading from the interior out to the garage.  When he yelled

21 out, the two black males exited the garage and ran off into a

22 wooded area.

23 **BY MR. POUSSON**

24 Q    Was any evidence recovered at that crime scene?

25 A    Yes, sir.  The next day, on Monday, June 24th, at about

Case 1:13-cr-00339-NCT   Document 68   Filed 07/07/14   Page 15 of 71

1  2:50 p.m., a resident at 205 Sedgemoor Drive reported to our

2  agency, the Cary Police Department, that he had recovered a

3  .177-caliber magazine that sits into a BB, or pellet, gun in

4  his yard.

5  Q    You mentioned observing -- well, let me take you back to

6  the Pathfinder that you observed wrecked after the Jared's

7  robbery.  Did you observe any form of weapon inside that

8  vehicle?

9  A    Yes, sir.

10 Q    And what was it that you observed?

11 A    There was a -- it appeared to be either a handgun or a

12 possibly a pellet gun, and it was in the sleeve behind the

13 driver's hand -- driver's side seat.

14 Q    And did the -- did that weapon have a magazine in it at

15 the time that you observed it?

16 A    No, sir, it did not.

17 Q    Did you subsequently have any occasion to compare the

18 magazine that was recovered from Sedgemoor Drive with the

19 weapon that was recovered inside the Pathfinder after the

20 Jared's robbery?

21 A    Yes, sir, I did.

22 Q    And when did that occur?

23 A    That took place on Tuesday, June 25, at approximately

24 8:00 p.m.

25 Q    And what happened when you made that comparison?  What did

1  you find?

2  A    The magazine that was recovered in the yard of 205

3  Sedgemoor Drive, that fit into the pellet gun that was

4  recovered from the Nissan Pathfinder.

5          **MR. POUSSON:**  Your Honor, I don't believe I have any

6  further questions for Detective Young.

7          **THE COURT:**  Mr. Davis?

8          **MR. DAVIS:**  If I could have just a second, Your

9  Honor?

10          **THE COURT:**  You may.

11                      CROSS-EXAMINATION

12  **BY MR. DAVIS**

13  Q    Detective Young, the lady that was involved in the

14  incident on June 23rd, was she able to identify any one of the

15  assailants?

16  A    No, sir.

17  Q    Did she describe any clothing?

18  A    I don't have that in front of me.  If -- I don't have that

19  information in front of me.  She did provide us with a

20  description.  It was two black males, and I believe she gave

21  dark clothing.

22  Q    And you compared the magazine with the BB gun that was

23  found in the Pathfinder; is that correct?

24  A    Yes, sir.

25  Q    What kind of BB gun was it?

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1  A    It was a .177-caliber BB gun.

2  Q    Is that the type of BB gun or pistol that you can find at

3  Wal-Mart?

4  A    Yes, sir.

5  Q    Nothing particularly special about that particular type of

6  BB gun?

7  A    Nothing about the BB gun.  The relationship was that when

8  the males fled from the garage at 106 Sedgemoor, there was a

9  female that was out walking her dog, and she actually saw the

10  two black males run down Sedgemoor and through the backyard of

11  205 Sedgemoor; and there is a cut-through that goes across to a

12  shopping center behind 205 Sedgemoor.  So that sort of made our

13  relationship between the magazine and the incident at 106

14  Sedgemoor relevant.

15  Q    Was the magazine checked for fingerprints?

16  A    No, sir.  The individual that recovered it had actually

17  not -- he had recovered it himself, so it would have been

18  contaminated.

19  Q    Any DNA?

20  A    No, sir.

21  Q    So whether the magazine that was located came from the

22  pistol that was found in the Pathfinder, there is no way to

23  actually say?

24  A    I don't have any forensic evidence, no, sir.

25  Q    Was there an effort to obtain -- well, did the lady say

Case 1:13-cr-00339-NCT   Document 68   Filed 07/07/14   Page 18 of 71

1  that the individuals were wearing gloves?

2  A    I'm sorry.  I don't have that report directly in front of

3  me.

4  Q    Well, did she say -- did she, in fact, say that they were

5  not wearing gloves?

6  A    I do not recall.  I'm sorry.

7  Q    Do you recall that there was an effort to obtain DNA from

8  the individual, the lady, since the persons supposedly touched

9  her?

10  A    I do believe that we did do some swabs from her.  I

11  believe that our City-County Bureau of Identification obtained

12  touch DNA from her, but, again, I am going off of memory.  I

13  don't have that particular report in front of me.

14  Q    As of this date, have any one of these three young men

15  been charged with that incident?

16  A    No, sir.

17  Q    And you were notified about the Jared Jewelry robbery and

18  the subsequent wreck?

19  A    I learned of the wreck from the Durham Police Department

20  requesting assistance from the Cary Police Department

21  pertaining to the wreck and subsequent jump-and-run of

22  individuals.  I responded to that; and upon arriving at the

23  scene and speaking with Durham police officers on the scene, I

24  learned about the Jared Jewelers robbery.

25  Q    And based upon the information that you learned in

1  subsequent events, did you learn that Mr. Irick gave a

2  voluntary statement indicating his involvement in the

3  McDonald's and the Wells Fargo incidents?

4  A    Yes, sir.

5  Q    At the time that he was interviewed, was the incident on

6  Sedgemoor Drive known?  Were you aware of that incident?

7  A    Yes, sir.

8  Q    Was there any questioning of Mr. Irick concerning that

9  incident?

10 A    I was not -- no, sir.  I was not present for that one, and

11 Durham Detectives did not have that information for me.

12 Q    Do you have any information that would indicate that the

13 weapon that was used during the Wells Fargo or the McDonald's

14 incident was anything other than a BB pistol?

15 A    No, sir.

16 Q    You watched the surveillance video of the McDonald's

17 incident?

18 A    Yes, sir, and the Wells Fargo.

19 Q    And were -- did each one of those videos show the weapon

20 that was used?

21 A    Yes, sir.

22 Q    Did you make any comparison between the weapon that

23 appeared on the videos and the weapon that was found in the

24 Pathfinder?

25 A    No, sir.

1  Q    Did they look similar?

2  A    The footage is not that good.

3  Q    Okay.  So whether there was a real gun or a BB gun, there

4  is no way to say at this point?

5  A    I can only go on the reaction of the victims involved in

6  these two incidents and their statements to me, and they all

7  believed it to be a handgun that was --

8  Q    I understand.  As far as whether it actually was a BB

9  pistol or a regular gun, there is no other evidence to show

10 either way?

11 A    No, sir.

12 Q    Okay.  The individual at the Wells Fargo, was he injured

13 in any way?

14 A    No, sir.

15 Q    The individuals at the McDonald's, was there any injury to

16 anyone?

17 A    There were no physical injuries.  I do believe that there

18 were some -- I believe one of the employees had to take some

19 time off due to the --

20 Q    Was that the manager?

21 A    I believe so, yes, sir.

22            **THE COURT:**  Due to what?

23            **THE WITNESS:**  Due to the emotional trauma of the

24 incident.

25            **MR. DAVIS:**  Those are all the questions I have, Your

1  Honor.

2           **THE COURT:**  Mr. Shoaf?

3           **MR. SHOAF:**  Thank you, Your Honor.

4                    CROSS-EXAMINATION

5  **BY MR. SHOAF**

6  Q    Detective Young, from what you know of the evidence, how

7  many firearms or BB pistols were involved in the Jared robbery?

8  A    I am not familiar enough with that particular incident.

9  I'm sorry.

10 Q    How many firearms were used in the McDonald's robbery?

11 A    In the McDonald's, there was at least one that I recall

12 clearly seeing on video.  In reviewing the report, it appears

13 that only one subject had a handgun.

14 Q    Okay.  And Ms. Crews stated that she observed a handgun in

15 each of the suspects' hands that were standing in front of her,

16 and that was two of them; is that correct?

17 A    I am looking for that statement right now, sir.

18 Q    I believe that's in the report from Investigator Mitchell.

19 I don't know if you have that.

20 A    Sir, I believe you are referring to an incident that took

21 place -- that's not the McDonald's incident, sir.

22 Q    All right.  Did Mr. Byrd make any statement to any law

23 enforcement officers about any of these incidents?

24 A    Not to my knowledge, sir.

25 Q    Have any of the handguns from any of these other

Case 1:13-cr-00339-NCT   Document 68   Filed 07/07/14   Page 22 of 71

1  incidents, other than the Jared's, been recovered?

2  A    No, sir.

3            **MR. SHOAF:**  I have no further questions.

4            **THE COURT:**  Mr. Huggins?

5            **MR. HUGGINS:**  Yes, Your Honor, just a few questions.

6                         CROSS-EXAMINATION

7  **BY MR. HUGGINS**

8  Q    Detective Young, you stated that Mr. Shivers had made a

9  statement regarding some of these incidents you testified to?

10  A    Yes, sir.

11  Q    Did you bring a copy -- a written copy of those

12  statements?

13  A    That statement was made to one of the Durham detectives,

14  and I believe I do have his report with me.  I do not see a

15  written statement from any individual other than Mr. Irick, but

16  I do have the detective's report pertaining to his interview of

17  Mr. Shivers.

18  Q    Do you know whether or not Mr. Shivers was read his

19  *Miranda* rights at the time?

20  A    Yes, sir, I have a warning and waiver that was dated and

21  signed June 25 at 2:10 a.m. for Mr. Shivers.

22  Q    Is that in relation to these incidents you stated he

23  admitted to?

24  A    Yes, sir.

25  Q    And did you speak with the officer that interviewed him?

1    A    Yes, sir, I did.

2    Q    But you don't have his statement today; is that correct?

3    A    I have the officer's report.

4    Q    Just the officer's report?

5    A    Yes, sir.

6              **MR. HUGGINS:**  No further questions, Your Honor.

7              **MR. POUSSON:**  Nothing else, Your Honor.

8              **THE COURT:**  When you refer to what Mr. Shivers said,

9    was it your testimony earlier that he implicated Mr. Irick and

10   Mr. Byrd in the McDonald's and the Wells Fargo robbery and not

11   himself?

12             **THE WITNESS:**  Yes, sir.

13             **THE COURT:**  In the Wells Fargo robbery?

14             **THE WITNESS:**  Yes, sir.

15             **THE COURT:**  Did he say anything about the McDonald's?

16             **THE WITNESS:**  Mr. Shivers advised that -- he

17   explained to Detective Guardino with Durham that Rodney Byrd

18   had devised a robbery plan days before they did it and that

19   Mr. Byrd asked Mr. Irick and Mr. Shivers to be a part of it.

20             **THE COURT:**  Of what?

21             **THE WITNESS:**  The robbery at McDonald's.

22             **THE COURT:**  Does he say he participated in the

23   robbery at McDonald's?

24             **THE WITNESS:**  Yes, sir.  He stated several times that

25   he should have not done the robbery.

Case 1:13-cr-00339-NCT   Document 68   Filed 07/07/14   Page 24 of 71

1      **THE COURT:**  And you are specifically referring to the

2  one at McDonald's?

3      **THE WITNESS:**  Yes, sir.

4      **THE COURT:**  And not just Jared's.

5      **THE WITNESS:**  Not just Jared's, according to

6  Detective Guardino's report.

7      **THE COURT:**  Mr. Huggins, do you have anything further

8  as a result of what I asked?

9      **MR. HUGGINS:**  Just a couple questions, Your Honor.

10     **THE COURT:**  Sure.

11  **BY MR. HUGGINS**

12  Q   Did he say McDonald's in that report?

13  A   Yes, sir.  May I quote from where I am reading from?

14  Q   Yes, sir.

15  A   "Shivers explained to me that Devin devised a robbery plan

16  days before they did it and asked Vendai and himself to be a

17  part of it.  He stated Devon's real name is Rodney Byrd, and he

18  works at McDonald's at Cary Towne Center.  He stated that he

19  thinks Vendai's last name is Irick and has a tattoo of 'Irick'

20  on his chest.  Shivers stated several times that he, quote,

21  fucked up and should not have done the robbery.

22     "I showed Shivers two photos I received from the video

23  surveillance footage at Jared's.  One photo shows a black male

24  with sunglasses and a light blue hoodie with words written

25  across the front of the hoodie.  Shivers identified this person

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1  as himself.  I showed Shivers a second photo of a black male

2  with sunglasses, dark blue jacket, and Indians logo hat.  He

3  identified this person as Rodney Devin Byrd."  That's the

4  information I am reading from.

5      Now, prior to that, they are discussing the incident at

6  Jared's.  So reading from somebody else's report --

7  Q    This is just basically how you read the report; is that

8  correct?

9  A    That's the information I am testifying from.  I am

10 interpreting somebody else's report.

11            MR. HUGGINS:  No further questions, Your Honor.

12            THE COURT:  Mr. Shoaf, do you have anything further?

13            MR. SHOAF:  Nothing further.

14            THE COURT:  Mr. Davis?

15            MR. DAVIS:  No, Your Honor.

16            THE COURT:  Mr. Pousson?

17            MR. POUSSON:  No, Your Honor.  Thank you.

18            THE COURT:  Thank you, Detective.

19      (At 10:37 a.m., the witness excused)

20            THE COURT:  Mr. Pousson?

21            MR. POUSSON:  Your Honor, the government doesn't ask

22 to offer any further evidence.

23            THE COURT:  Mr. Davis, at this point do you have

24 evidence?

25            MR. DAVIS:  No, Your Honor.

```
1              THE COURT:  Mr. Shoaf?

2              MR. SHOAF:  No, Your Honor.

3              THE COURT:  Mr. Huggins?

4              MR. HUGGINS:  No, Your Honor.

5              THE COURT:  I would be glad, Mr. Davis, to hear from

6  you.

7              MR. DAVIS:  Your Honor, first, I would like to

8  acknowledge the presence of Mr. Irick's family.  His

9  grandfather, his mother, and other relatives, brother and aunt,

10 all are here.  Some have come all the way from South Carolina

11 to be with him.

12      Your Honor, there is no question that this is a serious

13 offense.  All of the events that have been testified to are

14 serious.

15      June 2013 was certainly not a good month for Mr. Irick in

16 his life because when he messed up, he messed up in a big way,

17 and I've explained that to him.

18      In spite of the fact that he's 22, he's very immature for

19 his age.  As I have indicated in my position paper, a lot of --

20 I would interpret a lot of his involvement in these events is a

21 result of his immaturity.  As serious as the offense -- the

22 events are, it's not something that had been typical for him up

23 until this time; and why he chose to get involved in these

24 activities at this particular time, I don't know.  He's not

25 been able to give me any satisfactory answer.  I don't even
```

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1  think he understands exactly why he did what he did.

2      As the officer testified and as all of the reports have

3  indicated, that when he turned himself in and was interviewed,

4  he readily admitted his involvement, not only in the Jared's

5  robbery, but he also admitted his involvement in the McDonald's

6  and the Wells Fargo robbery.

7      You know, I have gone over and over with him as to whether

8  or not there was anything else that he had been involved in,

9  and it appears that that was the extent of his involvement in

10  the Jared, the McDonald's, and the Wells Fargo robberies.

11      Your Honor, I have in my position paper asked the Court to

12  vary downward based on his immaturity, and I set forth the

13  reasons why I think that would be appropriate.

14      Regardless of whether the Court imposes a sentence within

15  the guidelines or below the guidelines or above the guidelines,

16  I would contend that a sentence of 84 months would be a serious

17  matter, would certainly be severe punishment for someone who's

18  never been in any real trouble before, and would be sufficient

19  punishment and at the same time give him an opportunity to get

20  his life together, to grow up.  If he got a 7-year sentence,

21  when he got out, he would be 29.  Hopefully, that time in

22  prison would be sufficient to help change his way of thinking,

23  decision-making because certainly he definitely has to change

24  that pattern.

25      I don't know what's going to happen with the charges in

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1  Raleigh.  Those matters are still pending, have not been

2  dismissed.  I doubt they will be dismissed.  Whatever

3  punishment he gets over there -- you know, I don't know.  I

4  would ask the Court that since those matters are pending -- I

5  understand the Court is probably going to take those into

6  consideration in deciding what sentence to impose, but at the

7  appropriate time, those matters will be addressed in another

8  court.

9      So I would ask the Court to consider varying downward.  If

10  the Court feels that a downward variance is not sufficient,

11  then I would ask the Court to sentence him toward the lower end

12  of the guidelines.  Thank you, Your Honor.

13          **THE COURT:**  Thank you, Mr. Davis.

14      Mr. Shoaf -- let me start off -- Mr. Irick, Mr. Byrd,

15  Mr. Shivers, what I do is start off hearing from the

16  defendants' lawyers, and then I will hear from the government's

17  lawyer.  So each of you will have an opportunity to hear what

18  the lawyers say before you have a turn to speak so you will

19  know what each has said, and then I will be glad to hear

20  whatever it is you would like to say.  You don't have to say

21  anything; but after hearing your lawyer and the government's

22  lawyer, if you would like to speak, then you may say anything

23  that you wish.

24      Mr. Shoaf, on Mr. Byrd's behalf?

25          **MR. SHOAF:**  Thank you, Your Honor.  I have had

extensive conversations with Mr. Byrd's father, and there are
several family members here with his father.  If you would all
raise your hands that are with Mr. Byrd.  They've all been very
concerned about him.

In my memorandum to the Court, I did mention that this
young man is -- he is only 20 years old, and he is responsible
for his acts, but he is very -- he has the immaturity of a
young person.

His father -- as I said, we've talked a good bit.  If the
Court would allow, at the proper time, he would like just to
say a few words to the Court.  I would be glad to put him up.

**THE COURT:**  That's --

**MR. SHOAF:**  And I would say, Your Honor, before I put
him up, that this young man -- as I wrote this memorandum with
respect to sentencing, the first thing that I did and it is --
lists the things that they did, and it's -- not only is it
serious, it's very frightening, and I think the Court has heard
from the victim in the case.

It almost -- and I said in my paper, it almost seems like
something you would see on television, that they would do all
of these things.  I would argue to the Court that they are
responsible, but they are awfully young, and I don't -- as Greg
said, I don't know why they would go out and do something like
this.

He is looking at 151 to 188 months, and I am asking the

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1  Court to consider the low end.  That's over 10 years, and I

2  think it would be sufficient but not greater than necessary to

3  punish this young man; and, hopefully, he will have a life

4  afterwards.

5       I would ask that his father come forward, as he wants to

6  have some say to the Court.

7            **THE COURT:**  Sure.

8  **RODNEY BYRD**, DEFENDANT'S WITNESS, at 10:46 a.m., being first

9  duly sworn, testified as follows:

10                      DIRECT EXAMINATION

11  **BY MR. SHOAF**

12  Q    Sir, state your name, please, sir.

13  A    Rodney Byrd.

14  Q    Mr. Byrd, you are the father of Rodney Byrd, my client?

15  A    Yes, sir.

16  Q    And when this incident happened, was he living at your

17  home?

18  A    Yes, sir.

19  Q    I believe, according to the presentence report, for about

20  the first 11 years of his life, he lived with his mother?

21  A    That would be accurate.

22  Q    And then he's been living with you since then?

23  A    Yes, sir.

24  Q    All right.  And did he go to high school while living with

25  you?

1  A    Yes, sir.  Devin actually started middle school when we

2  moved from Charlotte to Cary, and he started actually in the

3  fifth grade, and we moved early in his fifth grade year to

4  Cary, and he started middle school there and continued to

5  graduate from Cary.

6  Q    Are there any other siblings in the home?

7  A    Yes, sir.

8  Q    Do you have any other sons and daughters?

9  A    I have a daughter that's 13 years old now.

10 Q    So she's a half-sister?

11 A    Yes, sir.

12 Q    Okay.  After high school, I believe he enrolled in some --

13 what was the school?

14 A    Community college at -- Guilford Tech Community College

15 here in Greensboro.

16 Q    Had you had some discussions with him about what he was --

17 what track he was on to do?

18 A    Yes, sir.  Initially, after Devin's graduation, he had

19 considered going into the military, and we offered him the

20 opportunity to explore that first year.  You know, if he didn't

21 want to go to a four-year college, which we had set out and

22 prepared for him to, that we would come back after a year and

23 look at some opportunities for him at that time.

24     Devin had an interest in becoming an engineer.  He asked

25 us if he could move to Greensboro to attend the Guilford Tech

1  Community College, which he did, and with hopes of transferring

2  into North Carolina A&T.  That didn't happen.

3      He came home the spring of 2013.  He acquired two jobs.

4  He was actually working before he came to Cary.  He was working

5  in Cary.  He was coming home a few weekends early in the spring

6  of 2013 where he had obtained two jobs.  He was working both

7  jobs while living in my house at that time.  So he had plans of

8  going back in August of 2013 as well.

9  Q    I believe you told me that right before this crime took

10  place, you and he had a discussion about his future?

11  A    Yes, in-depth discussions almost daily.  I work from home,

12  and I'm at home with him.  He was living in my house.  I was

13  taking him back and forth from work.  His plans were to save

14  money to get a car, and that's something that we had challenged

15  him to -- you know, if he could bring forth his part, we would

16  help to get him a car before he goes back to school in August.

17      We had long conversations about the future, and, you know,

18  I talked about my life, how I came up, and what, you know,

19  encouraged me to go to college and encouraged my wife to pursue

20  the career that she pursued and what we were hoping for him,

21  you know; and I just kept giving him encouragement every day to

22  want to do more with himself, not just settle for a fast-food

23  job but, you know, aspire to be more than that and use his

24  skills, and Devin has great talent.  He has great talents that

25  he just wasn't putting into action, you know, and I knew they

1  were there.  He's very compassionate about a lot of things and

2  about people.  So this was quite alarming to me, to say the

3  least.

4  Q    In 2011, there was a breaking or entering; and then after

5  that, there was a misdemeanor possession of marijuana in 2013,

6  and you say he was living in your house.  Did you discuss those

7  matters with him, and did you think he understood that those

8  were bad things, that he shouldn't be doing anything against

9  the law again?

10 A    Yes, sir, I did, and I can speak to both matters.  In the

11 2011 case, Devin ran into a friend that he was friends with

12 from high school that was going to -- he met at the YMCA.  They

13 played a lot of basketball together.

14     I remember the night that I picked Devin up from work.  He

15 was working at T.J. Maxx part-time, and the gentleman and

16 another guy was there.  Devin hadn't seen the guy in maybe two

17 or three years.  He had moved and transferred to another

18 school, and that was the first time he had seen him in a few

19 years.

20     A couple weeks later, Devin said that the two young men

21 called him about -- asking to inquire where they could purchase

22 some marijuana, and Devin said he didn't know anyone.  He knew

23 of a guy, a young kid, that was an engineering student at UNC

24 Charlotte at the time that Devin was friends with.  He said

25 that Devin introduced him to that guy, and so the guys devised

1  a scheme, I guess, to get Devin to ride with them.  Devin

2  didn't know what they were going to do.

3      So they went with this guy to a man's house, an adult, for

4  the young man to try to obtain some marijuana.  When the man --

5  the man had this young Indian kid with him.  He saw the kids

6  that was in car.  He said that he wasn't going to do anything

7  like that.  In turn, the guys put Devin's friend out and made

8  Devin ride back with them to the kid's house.  Devin sat in the

9  car, and they went inside the house.

10     During that time, when he went to court, it was clearly

11 stated that, you know, he was -- he didn't go into the house.

12 There was no evidence that he went into the house.  It was just

13 the fact that he rode with them and came back.  This was all,

14 you know, something that he didn't know was going to happen,

15 and it happened.

16 Q    But, yet, it revolved around drugs?

17 A    It did.

18 Q    And the incident in 2013 also was marijuana.  Did you

19 suspect that he was starting to use drugs?

20 A    Well, I had a concern about marijuana.  I never could --

21 you know, I never did have him tested or anything, but I was

22 always concerned if that's what he was doing.  He never had any

23 kind of body odor or anything that smelled like marijuana in

24 the house, but I probably could have assumed that he and his

25 friends were probably using marijuana away from the home.

1  Q    I believe you stated that he was working, and you said

2  sometimes two jobs.  He also had a curfew; right?

3  A    Yes.

4  Q    You imposed a curfew?

5  A    Yes, sir, I did.

6  Q    And he was supposed to be home at a certain time?

7  A    Yes, sir.

8  Q    And did he do that?  Did he comply?

9  A    He complied with that all the way up until the time this

10 stuff happened.

11 Q    And you had no clue as to -- that this was going to

12 happen?

13 A    Not at all, sir.

14 Q    Did you know these other two young men?

15 A    No, sir.

16 Q    Had they ever been in your home?

17 A    The only person I seen -- Vendai had come to the house one

18 time to help Devin move some of his clothes when he was moving

19 to Greensboro, and he never entered the house.  He was just

20 outside.

21 Q    So you never had seen them all three together?

22 A    No.  I wouldn't consider them to have been Devin's close

23 friends.  I mean, his close friends are people that we knew

24 that would come to the house.

25 Q    And he is -- Rodney has had ADHD or ADD?

1  A    He was diagnosed with ADHD -- well, ADD initially by a

2  family doctor, his pediatrician at the time.  He was having

3  some issues in school with impulsivity and hyperactivity sort

4  of interfering with his ability to learn and stay focused in

5  class.

6  Q    Did he continue to be treated for this?

7  A    Yes, sir, up until 2011, if I am not mistaken, until he

8  reached almost age 18.

9  Q    And you and your family will be there for him when he gets

10 out?

11 A    110 percent.

12 Q    And you would like for him to be sent somewhere close by

13 as far as -- as close as possible so that you can visit?

14 A    That's exactly right.

15 Q    Do you think he needs some psychological help while he is

16 in prison?

17 A    Yes, sir, I do.

18         **MR. SHOAF:**  No further questions, Your Honor.

19         **MR. POUSSON:**  If I could briefly, Your Honor?

20         **THE COURT:**  You may.

21                   CROSS-EXAMINATION

22 **BY MR. POUSSON**

23 Q    Mr. Byrd, you talked briefly about your son's prior

24 misdemeanor drug offense; is that correct?

25 A    I didn't mention anything about -- yes, yes, one incident,

1  yes.

2  Q    Was he living with you during that time?

3  A    Yes, sir.

4  Q    And did you talk to him about that incident?

5  A    Yes.

6  Q    And did you know that he was placed on probation for that

7  incident?

8  A    Yes, sir.

9  Q    Was that probation -- during the period when he was on

10 probation, was he living with you?

11 A    Yes, sir.

12 Q    Do you know how that probation ended?

13 A    He fulfilled the probation.  It was a one-year probation

14 that he fulfilled successfully.

15 Q    And you didn't know -- it's your understanding then that

16 he didn't have any problems on probation?

17 A    No, sir.

18 Q    You weren't aware of anything?

19 A    Not during that time.

20 Q    And during that time, he was living with you?

21 A    Yes, sir.

22 Q    Okay.

23         **MR. POUSSON:**  No further questions, Your Honor.

24         **THE COURT:**  Did you see his grades that he got when

25 he was at Guilford Tech?

1          THE WITNESS:  Yes, I have seen his grades from

2    Guilford Tech.

3          THE COURT:  Anybody have anything further?

4          MR. SHOAF:  Nothing, thank you, Your Honor.

5          MR. POUSSON:  No, Your Honor.

6          THE COURT:  Thank you, Mr. Byrd.

7       (At 10:56 a.m., the witness was excused.)

8          THE COURT:  Mr. Shoaf, will there be other evidence?

9          MR. SHOAF:  No, sir.  Thank you, Your Honor.

10          THE COURT:  Mr. Huggins, will there be evidence on

11   Mr. Shiver's behalf?

12          MR. HUGGINS:  Yes, Your Honor.  I would like to call

13   his mother, Miss Shivers, to the stand, please.

14   **PRUDENCE C. SHIVERS**, DEFENDANT'S WITNESS, at 10:56 a.m., being

15   first duly sworn, testified as follows:

16                        DIRECT EXAMINATION

17   **BY MR. HUGGINS**

18   Q    Good morning.

19   A    Good morning.

20   Q    Can you please state your full name for the Court.

21   A    My full name is Prudence Charlene Shivers.

22   Q    What is your relationship with Mr. Shivers?

23   A    I'm his mother.

24   Q    And where are you currently living at?

25   A    I'm currently staying in Fuquay-Varina right now.

1  Q    What is your occupation?

2  A    I am a sub-award manager for Duke Energy, a contracts

3  manager.

4  Q    Were you living in Fuquay-Varina when this particular

5  incident took place?

6  A    Yes, I was.

7  Q    Was Mr. Shivers living with you at the time?

8  A    No, he wasn't.  At the time that this happened, Denzel was

9  just permitted to come back home on that Saturday; but prior to

10 that, he was not living in the home.

11 Q    Now, is he the oldest of all siblings?

12 A    No, he is the second.

13 Q    How many children were you taking care of at the time of

14 this incident?

15 A    At the time of the incident, nine.  Can I clarify?

16        **THE COURT:**  I understand you are taking care of your

17 sister's children?

18        **THE WITNESS:**  Yes.

19        **THE COURT:**  You have five and she had four?

20        **THE WITNESS:**  Yes, sir.

21        **THE COURT:**  She has cancer?

22        **THE WITNESS:**  No, she was diagnosed with bipolar

23 disorder.

24        **THE COURT:**  I read that in the presentence report and

25 was just gratefully admiring and respecting what you were doing

1    in undertaking that.

2              **THE WITNESS:**  Thank you.

3    **BY MR. HUGGINS**

4    Q    How would you characterize your son?

5    A    Denzel is -- I don't mean -- I don't want to come against

6    him, but he is not as mature as his age, and that has always

7    been the case with him.  Denzel is loving.  He is caring.  He's

8    respectful of persons, just a beacon of light.  Everyone is

9    attracted to him.  There is no place that he can't go that they

10   will just not adhere to him.  He is always looking at

11   everybody.  There is not one plate that he is a part of, if

12   that makes sense.

13       He's always been fair, especially when it comes to

14   standing up for his siblings, you know, mom.  You know, he

15   always was defending his siblings.  A go-getter, you know,

16   strong, just a go-getter.  I've always tried to encourage him

17   to be that leader, but he always seems to fall into the

18   position of the follower.

19       He's a good young man.  He is a good young man.  In spite

20   of all that I have heard -- and this is the first that I've

21   heard coming to court of everything that has been brought

22   against him, the details, the explicit details.

23             **THE COURT:**  Were you in court when --

24             **THE WITNESS:**  Yes, when you did the continuance?

25   Yes, sir, we were.  That's one of the reasons, I might add,

1 that his other siblings could not come back.  It was just too

2 much for them.

3     I raised my kids as myself, that if you do something, you

4 stand up for it and you pay the Piper.  I always was so -- I

5 tried keep their life so structured such that they didn't have

6 room for those added indiscretions.  Idle hands is the devil's

7 playground, and I've always tried to keep him busy.  He loves

8 basketball.  Basketball was his thing.  He was in school.  He

9 was doing good.  All of a sudden, I should have known something

10 was going wrong when he just all of a sudden just stopped, and

11 it always followed right after basketball.

12     His coaches love him.  His teachers love him.  He is known

13 in Fuquay-Varina.  You can walk up and down the street and just

14 say Denzel's name, and everybody says, "We love him."

15 Q    Has he been remorseful about his actions?

16 A    Greatly to such that I have asked, not you but the prior

17 attorneys that were given to him, to make sure that there is

18 not anything -- just to make sure that he has someone to

19 counsel him while he was awaiting for all of this because it

20 was a lot, but, yes, he's been gravely --

21 Q    During this time, he had started using a new drug,

22 cocaine; is that correct?

23 A    Denzel's mind on marijuana is not a good thing.  Denzel's

24 mind and Denzel's mind on cocaine is even worse.  I had no idea

25 that he was using cocaine.  If I had a clue, he would have been

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1   the first one at a rehab.

2           **THE COURT:**  The information that we have is that he

3   had been abusing marijuana since he was 12.  Did you have any

4   information about that?

5           **THE WITNESS:**  That is a lie.

6           **THE COURT:**  Well, that came from him.

7           **THE WITNESS:**  There is no way -- since he was 12,

8   Your Honor, he would have to have been in my house abusing it.

9   Twelve years old, Denzel was playing AAU basketball.  Twelve

10  years old, Denzel he was in school.  Twelve years old, he was

11  in church.

12          **THE COURT:**  Do you have any idea why he would tell

13  the probation officer --

14          **THE WITNESS:**  I have no idea.  I don't even know how

15  Denzel was even able to give the statements that he did to the

16  officers because he was in the hospital.  So there is a lot

17  that I have -- that I would love to challenge, but it's not

18  good for him for it, but I don't know why he would say

19  something like that.  If you want to verify, he has an annual

20  physical every year, every year.

21          **THE COURT:**  Well, they don't test for things like

22  marijuana.

23          **THE WITNESS:**  Oh, but I have had drug tests on him,

24  and they came back negative.  When I suspect something of my

25  own, I tested him, and they came back negative, and that was

1    done in Cary.

2              THE COURT:  Thank you, ma'am.

3              MR. HUGGINS:  No further questions, Your Honor.

4              THE COURT:  Mr. Shoaf, do you have questions?

5              MR. SHOAF:  No.

6              MR. DAVIS:  No, Your Honor.

7              MR. POUSSON:  No, Your Honor.

8              THE COURT:  Thank you, ma'am.

9         (At 11:03 a.m., the witness was excused.)

10             THE COURT:  Will there be further evidence,

11   Mr. Huggins?

12             MR. HUGGINS:  No further evidence, Your Honor.

13             THE COURT:  Mr. Pousson, you have no further

14   evidence?

15             MR. POUSSON:  No, Your Honor, that's correct.

16             THE COURT:  Why don't we take our regular mid-morning

17   recess at this time for about 15 minutes.  Then when we come

18   back, I will hear whatever Mr. Pousson would like -- well, I

19   haven't heard from you yet, Mr. Huggins.

20             MR. HUGGINS:  Yes, Your Honor.

21             THE COURT:  I'll hear from you and then we'll hear

22   from Mr. Pousson about each of them, and then I will hear from

23   each of the individuals.

24             MR. HUGGINS:  Thank you, Your Honor.

25        (The Court recessed at 11:04 a.m. and was called back to

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1      order at 11:31 a.m.)

2      (The Defendants were present.)

3           **THE COURT:** Mr. Huggins?

4           **MR. HUGGINS:** Yes, Your Honor. On behalf of

5  Mr. Shivers, Your Honor, first and foremost, I would like to

6  recognize his family members who are present: Miss Shivers,

7  who just recently testified -- if you guys would please

8  stand -- his father, Charlie Shivers, as well as his sister. I

9  just wanted to acknowledge them.

10      Secondly, Your Honor, I don't know if anyone has done

11 this, but Mr. Shivers gave me permission to do this. On behalf

12 of Mr. Shivers, we would like to apologize to the victim for

13 this particular incident and what she has had to endure and go

14 through because of what happened and because of these

15 individuals' actions.

16      Mr. Shivers has prepared an apology that he would like to

17 read later to the Court, but, just briefly, I would like to

18 talk about some of the 3553(a) characteristics as it relates to

19 my client, Your Honor.

20      Your Honor, as you can see, this was Mr. Shivers' first

21 time pleading guilty and being convicted of an offense. He was

22 working at Bojangles'. He was going to school. He was playing

23 basketball. He was on the right track.

24      And the question has come up: Why did these individuals

25 commit these actions? Well, one of the reasons I think that

Case 1:13-cr-00339-NCT  Document 68  Filed 07/07/14  Page 45 of 71

1  Mr. Shivers made that bad decision is he had actually used

2  cocaine for the first time on this particular day.  He had been

3  using marijuana previously, but he used cocaine and, while he

4  was high, made a decision to commit this action.  It does in no

5  way excuse his actions, but it helps to explain why he made

6  this bad decision.

7      Your Honor, the one good thing about Mr. Shivers I will

8  say is that he is still young.  He is only 20 years old, and he

9  still has an opportunity to turn his life around.  While he is

10 in custody, his mother has expressed this to me, he has

11 expressed this to me, that he would like to get in any and

12 every program that he can use to rehabilitate himself and make

13 himself a better person.

14     Your Honor, Mr. Shivers did a lot of damage that day, and

15 no words that I can say to the victim could make her whole

16 again from that action.  However, it would ultimately be her

17 responsibility to possibly forgive Mr. Shivers and some of the

18 other individuals for their actions, but no words that I can

19 say could make her whole for what Mr. Shivers did; but I can

20 say on behalf of Mr. Shivers from talking with him, spending

21 time with him, he has cried about his actions.  He has talked

22 about his actions.  He's spent at least nine or more months in

23 custody, and he realizes that this is no joke.  Being in court

24 today is no joke to him; and while spending time in prison --

25 or in jail awaiting the disposition of this matter, he has

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

gotten the sense of what life will be like for the next few years, and he is really afraid about that.

He understands that he faces this Court today and must be judged today, and he is ready to be judged and take responsibility for his actions, but one thing I can say on his behalf is that he's really sorry for what he has done; and if he was given a second chance, he wouldn't do it again.

Your Honor, it is my hope that after he spends this considerable amount of time in custody, that when he comes out and gets on supervised release, that he will become and be a better individual, that he will take advantage of every resource that he has and become a better individual so that he can be productive in society one day later on in the future.

Your Honor, I did state in my position paper that I am asking the Court to downward depart in this particular case. I am aware of the circumstances that surround this case, but, primarily, it is not to excuse his behavior as to why I am asking that. I am asking that because I am looking at his youthfulness. I am looking at his family support. I am looking at his immaturity. I am looking at the decision that he made while he was on drugs; and just getting to know him as a person, I still think that he has an opportunity or has a chance to be better. I don't think that spending the next 10 to 15 years in prison would necessarily be the answer to rehabilitate him. However, I am not saying that he should not

1  be punished, but what I am saying is considering all the

2  factors, considering what he has done outside of all this bad

3  stuff that we've heard today, we do see a man that does have

4  potential.

5      He's still young.  So he has that opportunity.  I've

6  represented people who have came to court at ages 50 and 60,

7  and I can understand why we consider them to not be turning

8  their lives around because they've built a lifestyle of

9  criminal behavior.

10      Your Honor, I am very sympathetic to what happened that

11  day to those victims.  My mother was a victim of armed robbery,

12  and I have seen how it has affected her life over the years.

13  So I do understand somewhat of what this victim has had to

14  endure and go through mentally, emotionally, and physically.

15      Your Honor, that will be it for the Court.  I would ask

16  the Court to just consider my position paper, consider his

17  criminal record, the fact that he has no prior convictions,

18  consider the testimony of his mother and his family support,

19  and I would ask that the Court would downward depart in this

20  particular case.

21          **THE COURT:**  Thank you, Mr. Huggins.  Mr. Pousson?

22          **MR. POUSSON:**  Your Honor, in looking at the nature

23  and circumstances of this offense, I believe Mr. Shoaf said it

24  best in that it almost reads like something you would see in a

25  movie.  I say that in a way that's not to glorify it in any way

but simply to say that the level of violence that was threatened in this case and the circumstances of this case are so unique and demonstrate such danger to the public that this offense, this robbery of Jared's, does, in fact, call for a very serious sentence.

One of the things that jumps out about this offense under the nature and circumstances is that it was clearly premeditated. We have a group of individuals who armed themselves with a BB gun ahead of time and who took the time to follow this victim back from her home. Many opportunities to turn off. Many opportunities to rethink what they were doing and to step away and to call it off. This was not a spur-of-the-moment thing. This was something that was deliberate, it was something that was planned, and it involved levels of threatened violence through the kidnapping, through the carjacking, through the robbery itself of over $400,000 in diamonds and jewelry and then two separate high-speed chases. It's hard to think of any other case where the nature and circumstances of the offense itself were so very dangerous and provided such a threat to the public at large.

But even though the listed victim in this case is Jared's, it's hard to read this and see the victim as the store when we have Amanda Hill, and we have the impact that this case is going to have on her.

Your Honor, probation has called for a sentence --

USA v. Vendai Irick -- Sentencing -- 4/17/2014

1  recommended sentences in this case between the middle and high

2  end of the guideline ranges for these various defendants, and I

3  submit that regardless of where the Court comes down in the

4  sentence, that certainly Miss Hill will live with this, the

5  trauma from this event far longer than these defendants will

6  serve in prison no matter what their sentences end up being.

7      I think, though the defendants have pointed to their

8  history and characteristics, they are all young.  Certainly

9  that is counterbalanced in this case by the danger to the

10 public, and the Court's duty in this case is to protect the

11 public from other actions like this and to send a message that

12 these are offenses that call for and demand serious punishment.

13      **THE COURT:**  Thank you, Mr. Pousson.

14      Mr. Irick, I would be glad to hear anything that you would

15 like to say.

16      **DEFENDANT IRICK:**  I would like to apologize to the

17 Court and my family.  I would like to apologize to Amanda Hill

18 and to the actions I did.  I am not a bad person.  I just got

19 caught up in the wrong thing.  That's all I have to say.

20      **THE COURT:**  Thank you, sir.  Mr. Byrd?

21      **DEFENDANT BYRD:**  Thank you, Your Honor.  First off, I

22 want to apologize to Miss Amanda Hill and her family and

23 everything that they have endured through our troubles and

24 everything that they have gone through during this action and

25 crime.

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1    I want to apologize to my family and all my loved ones and

2 to my co-defendants' families also for not being the voice of

3 reason, to step up and say, no, don't do this action or not to

4 take part in this or maybe change the situation that was going

5 to happen.

6    I feel as though the affliction that being locked up has

7 brought me through this nine months has changed me, changed my

8 mind.  Now I am not thinking cloudy as I was out in the streets

9 or out in the world.

10    I worked two jobs.  I was trying to do the right thing,

11 trying to go to school for engineering.  I was just trying to

12 do the right thing, and my mind --

13        **THE COURT:**  Mr. Byrd, excuse me for interrupting you,

14 but I have a tough time seeing your grades from Guilford

15 Technical College, thinking that you really were applying

16 yourself when -- you came in July and you left in December, and

17 your grades were way, way, way down.  You hardly got any

18 credits for being there.

19        **DEFENDANT BYRD:**  Yes, sir.  During that time, I was

20 also working a job at Burger King.  I was trying to pay for an

21 apartment at that time.  I was trying to pay for my own living

22 at that time because the technical school didn't house you, and

23 I had to pay for my transportation to the school.

24    So during that time, I just -- I really lacked -- if you

25 would just talk to my professors, I just really lacked in my

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1  performance on the exams due to studying or being there before

2  tests were taken and those things.  Even though my high school

3  record -- I wasn't always a good test taker.  I am not a good

4  test taker in many situations.  I just -- my mind just wanders

5  different ways when I am looking at bubble sheets or ways on

6  how to answer questions.

7      But in that aspect, that's why I took -- I went back home

8  because I really wanted to go into the military at first when I

9  graduated high school because I knew it was going to be hard

10 for me to apply myself with studying by myself and not having a

11 tutor or not having anyone there to hold my hand.  I had to do

12 it by my own, work and go to school and deal with a lot of

13 other things by myself, which was kind of hard.

14     But my parents gave me the option.  They were, like, just

15 give it a shot for one year, and I did that and I failed.  I

16 felt like a failure.  So I just basically ran away from my

17 problems, and that's kind of been my decision-making, like -- I

18 was on probation for 12 months.  I did the probation no

19 problem.  I came home in December.  I got in trouble in April

20 for having a misdemeanor possession of marijuana.

21     During that time, I was at home with my parents.  My dad

22 was talking to me, trying to get me back on the right track.  I

23 got working on two jobs.  He was driving me.  He was supporting

24 me.  He was my help, he was my push, and he was going to help

25 me go back to school maybe closer to home not as far away as

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1 Greensboro. He was going to maybe try to find something closer

2 to home. Maybe I could transfer to NC State and get in their

3 engineering program. He was going to basically hold my hand

4 and be my support system.

5 That's something I realized by being locked. My family

6 has still stood by me after hearing all of this, after going

7 through multiple things with me. They've always loved me.

8 During this time, I realized that I have to change myself. I

9 have to stand up, learn how to do it myself, go after school --

10 after -- as I go after my jobs or something simple. There's

11 more to life than just doing simple things. I want to be an

12 upstanding citizen in society and be somebody, as my parents

13 are. I look up to my dad in every aspect, and I want to be

14 like him someday.

15 That's all I have to say.

16 **THE COURT:** Thank you, sir.

17 Mr. Shivers, take your time. If you reach a point that

18 you want to just sit down and compose yourself, that's all

19 right.

20 **DEFENDANT SHIVERS:** I had a letter prepared for

21 Amanda Hill and you as well, but I figured that I might as well

22 speak from the heart because this is a serious moment in my

23 life.

24 I am sorry, Amanda, and your family, I am so sorry. Words

25 can't even express how sorry I am for you all. I've suffered

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1   some injuries behind this crime that I am going to have to live

2   with for the rest of my life just as well as you have been

3   traumatized behind this.  Don't feel like you are by yourself.

4        I know you are a good person.  I remember the night when

5   we did this, and you said you are a cool individual.  The

6   moment you told me that, I just wanted to turn around and not

7   even do it.  I am sorry.  I'm just so sorry.  I don't mean to

8   be so emotional or anything, Amanda.  I am really sorry.  I am

9   deeply sorry for her family as well and her husband, Joshua

10  Hill.

11       During my time in incarceration, Your Honor -- it's 10

12  months, but I've never been locked up before a day in my life.

13  I went to the hospital -- right from the hospital to jail into

14  an environment I never had no idea about other than TV.  It's

15  almost scary to know that being around certain individuals --

16  and I never even thought to consider the fact that I am putting

17  myself in this situation.  I've learned --

18       **THE COURT:**  It never occurred to you that if I get

19  caught for this, I am going away for a long time?

20       **DEFENDANT SHIVERS:**  To be honest with you, Your

21  Honor, I almost thought jail in the federal government was kind

22  of imaginary because I never could see myself actually doing

23  anything that would cause me to end up in such an environment

24  due to the fact that I have been playing basketball all my

25  life.  Basketball even -- I know that I had a 1.6 in high

```
 1  school and graduated with that.  It was a struggle due to the

 2  fact that I was also smoking marijuana throughout the high

 3  school period, and I couldn't really get into the classroom

 4  like I really wanted to, but I always made it in time so I

 5  could make sure that I was playing basketball, which is not --

 6  it was athlete before student, I'll put it; but now, since I

 7  went to community college, junior college, I've boosted my

 8  grades, you can say, by .6 points.  I don't know if you have

 9  the exact average -- my grade-point average in college, but I

10  am doing better.  It was a C average almost.  I made a couple

11  of Bs, and I was on my way to making myself a better person.

12       **THE COURT:**  You had researched this thing.  You had

13  done research on your cell phone of where Jared's was, and then

14  you looked into a place to rob.  They found that on your cell

15  phone.  I mean, this wasn't just something you chanced into or

16  fell into, and this wasn't the first time that you had been

17  involved in something like that.

18       You mean it never crossed your mind that if I get caught,

19  gosh, I may go to prison?  I may serve time if I get caught for

20  threatening somebody with at least what appears to them to be a

21  handgun?  Wouldn't have cared if it wouldn't appear to them to

22  be a handgun, the trauma, the misery it would cause to somebody

23  seeing what appeared to be a handgun.  Now their lives are

24  threatened.

25       That never crossed your mind that I if get caught, I am in
```

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1 serious trouble?

2      **DEFENDANT SHIVERS:**  Well, I researched the
3 whereabouts of Jared Jewelers the night of the crime, Your
4 Honor, and that was while I was under the influence of cocaine
5 for the first time.

6      **THE COURT:**  Didn't you ask questions about the
7 diamonds?

8      **DEFENDANT SHIVERS:**  While I was in the car, yes, I
9 did, Your Honor.

10      **THE COURT:**  Where did you get that information that
11 made you ask questions about diamonds?

12      **DEFENDANT SHIVERS:**  Well, I chose to commit a
13 robbery, so I was lost right then and there.  I was trying to
14 commit the robbery, Your Honor.

15      **THE COURT:**  While you are trying to do that, I mean,
16 it really didn't cross your mind, man, if I get caught, what's
17 going to happen?  Wasn't that why you all were running like you
18 did, trying to evade the police, so you wouldn't get caught,
19 and this wouldn't happen?

20      **DEFENDANT SHIVERS:**  It crossed my mind when we —

21      **THE COURT:**  I mean, you didn't give up when the
22 police came after you, did you?

23      **DEFENDANT SHIVERS:**  No, sir.  It crossed my mind when
24 I pulled up to Meridian Parkway and seen the cop car of Officer
25 Gregory, I believe it was, and — being under — there is no

excuse.  I accept full responsibility of what I did, Your

Honor.  That's not what I am talking to you about, but being

under the influence of cocaine is pretty serious.  You would be

surprised of the things you would consider about doing or

things you might say while being on it or do.  I just thank God

that Amanda Hill wasn't harmed physically while I was on this

drug.

Yes, it scared me seeing the police lights behind me; but,

for whatever reason, I mashed the gas, and it landed me --

well, it put me in a near death experience that I am always

going to remember for the rest of my life.  It's like a lesson

learned.  I am before you today trying to get some of my life

back because I know it's probably already gone right about now.

I just -- my main thing I just want to tell the courtroom

and everything is that I am truly sorry.  I apologize to the

Byrd family, my family, and Vendai's family, which always I

wanted to meet just as well as Devin's family.  I knew them

while I was in high school.  Due to the circumstances, you

know, maybe we can all forgive each other and move on from the

situation together as one.

That's all I got to say, Your Honor.  That's all I got to

say.

**THE COURT:**  Thank you, Mr. Shivers.  I know it's

tough to stand there.  You did a good job saying what you said

without reading.

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1    This was an absolute nightmare for Amanda Hill.  In
2 somebody's worse dreams, you would never think that somebody
3 would follow you into your driveway, pull what for all
4 appearances was a firearm, put it to your head, make you move
5 over into the passenger seat.  Somebody gets in the back of the
6 passenger seat, takes the firearm from the person who had
7 pulled it to start off with, Mr. Shivers.  Mr. Byrd is in the
8 backseat with the gun pointed up against her head, and they
9 drive from Creedmoor to Durham.  Creedmoor is not just one or
10 two miles from Durham.  Creedmoor is a piece down the road, as
11 Mr. Irick and Mr. Byrd found out the night before when they
12 were going to go maybe undertake the robbery on Sunday night
13 and ran out of gas because they didn't contemplate how far she
14 lived from the store.

15    Mr. Byrd tells her they've got somebody watching her home
16 and her family, and not only is she going to get her hurt if
17 she doesn't comply with their orders, but they are going to
18 have her family killed.  I mean, I can't imagine the horror
19 that somebody would go through.

20    I sat here and listened about people finishing --
21 graduating from high school, going to college.  Somebody in
22 that position has to understand -- immature or not, there has
23 to be a mental, intellectual understanding that if I threaten
24 somebody, I am telling them I am going to do something bad to
25 them or their family to make them do what I want them to do,

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1 that's the reason I am telling you that. You've got to

2 understand the effect that has, or they wouldn't do what you

3 were telling them to do. That's exactly what you wanted.

4 That's exactly what happened.

5     Then because somebody happened to see what was going on in

6 the parking lot and followed the cars and was able to

7 communicate with the police, when the police come, there is a

8 high-speed chase. Don't take into consideration who I might

9 hit trying to get away from these police officers. Drive as

10 fast as I can go just to get away. Doesn't matter whose life I

11 endanger, whether it's mine or the officers or some kid

12 crossing the street or some woman pushing a baby carriage

13 across the street.

14     And then we learn about the earlier criminal involvement,

15 the McDonald's robbery, Mr. Irick and Mr. Shivers. You know, I

16 agree Mr. Byrd didn't admit that he participated in that, but

17 wasn't it unusual that it was at his McDonald's that that took

18 place? That's too unusual to think it's happenstance.

19     Same thing, same -- not the same emotional trauma as would

20 be experienced by an individual who has had her life threatened

21 and that of her family on this long drive, but still traumatic

22 enough for the manager of the store to have to miss time

23 because of psychological injury.

24     You know, this was well thought out. You say something is

25 well thought out just because there is some planning that has

1  gone into it, and it was something, as Mr. Pousson mentioned,

2  that could have been stopped at any time.  You could have

3  decided after Sunday that we are not going to do this.  That

4  would hurt somebody.  You go back Monday.  Same thing; you say

5  do it.

6       The recommendations by the probation officer did not take

7  into consideration the evidence that I heard with regard to the

8  McDonald's -- robbery at the McDonald's.  Mr. Irick admitted to

9  the Wells Fargo robbery.  I will not hold either Mr. Byrd or

10 Mr. Shivers accountable for that, although it would be awfully

11 strange to think that somebody else was not involved, but I

12 will not hold them accountable for that.

13      But, in any event, the recommendations in the presentence

14 report did not take the McDonald's into consideration or the

15 Wells Fargo as far as Mr. Irick is concerned; but, Mr. Irick, I

16 am not going to increase your punishment just because you were

17 honest in telling about the Wells Fargo beyond what I would

18 have considered concerning the McDonald's.  So while I may

19 think that others were also involved, I am not going to punish

20 them for the Wells Fargo or to what happened to the woman in

21 her garage.  I am not going to punish you further because of

22 Wells Fargo just because you were honest.  I admire you for

23 being honest.

24           **DEFENDANT SHIVERS:**  Thank you.

25           **THE COURT:**  I do take into consideration your youth.

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1  That's true; younger people do not have the equivalent ability

2  that you hopefully will have at age 35, 40, but all of you have

3  the intellectual intelligence to understand what you were

4  doing, and you had lots of people endangered psychologically,

5  if not physically, terribly psychologically endangered,

6  physically endangered on the highway.

7      The 3553(a) factors, in considering those for Mr. Irick,

8  for Mr. Shivers, a sentence in the middle of the advisory

9  guideline range.  A sentence of 136 months is to be followed by

10 a period of 3 years of supervised release with the following

11 special conditions -- well, let me back up and say it.

12     In Mr. Byrd's case, a sentence of 175 months will be

13 followed by a period of 3 years of supervised release, and

14 there will be similar conditions for each of you in addition to

15 the standard conditions of supervised release:

16     You should provide to the probation officer any financial

17 information your probation officer requests.  You should

18 participate in any substance abuse testing regardless of what

19 type testing that is directed by your probation officer.  If

20 your probation officer instructs you to participate in

21 substance abuse treatment -- why don't we take a short break,

22 and we'll come back.  You let us know, Mr. Shoaf, when you are

23 ready.

24     (The Court recessed at 12:03 p.m. and was called back to

25     order at 12:10 p.m.)

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1       (The Defendants were present.)

2           **THE COURT:**  If the probation officer instructs you

3   during supervised release to participate in substance abuse

4   treatment, you should do that regardless of what type treatment

5   that is.  It could even be inpatient residential treatment.  It

6   may be just simple counseling.  We don't know.

7       If any type of treatment is directed, you may not use

8   alcohol as a beverage from the time whatever the treatment is

9   is scheduled to begin until it is scheduled to end.

10      You may be called on to pay for some or all of the

11  treatment.  We don't know even from one year to the next how

12  much money the courts may have to pay for that.  So we can't

13  say the courts would have the money to do that.

14      Now, with regard to restitution, it is my understanding,

15  Mr. Pousson, that the diamonds were recovered?

16          **MR. POUSSON:**  Yes, Your Honor.  I believe there was

17  testimony at the last hearing there was one item that was not

18  recovered.

19          **THE COURT:**  That had a value of $350?

20          **MR. POUSSON:**  Yes, Your Honor.  I believe everything

21  else was recovered.

22          **THE COURT:**  With regard to the damage to Miss Hill's

23  car?

24          **MR. POUSSON:**  My understanding is that insurance

25  covered her damage, and that she simply had a 50-dollar

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1 deductible that she mentioned last time.

2       **THE COURT:** So the amount owed to Geico was some

3 $11,050; is that correct?

4       **MR. POUSSON:** I believe that's what she testified to.

5 I wasn't present for that hearing, but I believe that's what I

6 was told she testified to.

7       **THE COURT:** The Durham Police Department never --

8       **MR. POUSSON:** The Durham Police Department did not

9 submit a claim for any damage.

10       **THE COURT:** For the Durham car that was dented during

11 the getaway?

12     As to those amounts that I just mentioned -- the $350, the

13 $50, the $11,500 -- each of the defendants shall be liable to

14 make restitution jointly and severally. That means each of you

15 are each liable to pay, but all of you have an obligation to

16 pay. If your co-defendants pay, you get credit for what they

17 have paid; but if they don't pay, it's your responsibility to

18 pay it all. So each of you are going to have to make some

19 payment. It may be collected while you are in prison by the

20 Bureau of Prisons or maybe when you are on supervised release.

21     Now, with regard to the amount on supervised release that

22 each of the defendants might be expected to pay, Mr. Davis,

23 what are your thoughts with regard to Mr. Irick's ability?

24       **MR. DAVIS:** Your Honor, based upon his limited

25 previous employment, I would be afraid to say that he would

USA v. Vendai Irick -- Sentencing -- 4/17/2014

1  have the ability to pay more than $100 a month.  I think that

2  would be reasonable.  I've discussed with him participating in

3  as many vocational programs to enhance his chances of getting a

4  job paying a little more than minimum wage.  Hopefully, if he

5  does that, $100 a month might be reasonable.

6          **THE COURT:**  Thank you.  Mr. Shoaf?

7          **MR. SHOAF:**  Your Honor, I think Probation Officer

8  Wright has put $100 in the presentence report.  I would expect

9  that hopefully his father can help him, and, hopefully, he'll

10  do some education in --

11          **THE COURT:**  His father shouldn't be expected to do

12  that.  Let's talk about what this Mr. Byrd --

13          **MR. SHOAF:**  What I meant was his father can probably

14  help him to get some employment because he's helped him to do

15  that before.  I didn't mean that he would pay it.  Hopefully,

16  that will be an asset that he has to help him get employment.

17  So I would think, Your Honor, that at least $100 would be

18  doable.

19          **THE COURT:**  Mr. Huggins, in Mr. Shivers' case?

20          **MR. HUGGINS:**  Yes, Your Honor, we would ask for the

21  same thing.  He's held down several jobs.  He is a very

22  responsible individual.  He would be able to make that

23  100-dollar payment as well.

24          **THE COURT:**  Then, let's say, starting 60 days from

25  the time each begins supervised release, that restitution

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1 payments in the amount of $100 per month would be made with the

2 understanding that if you are really doing all you can to get a

3 job and make those payments and the circumstances are such that

4 you are not able to do that, your health, the economy -- you're

5 really making a good effort but you can't do it, then you and

6 your probation officer can come back to the Court and ask the

7 Court to reduce that amount.

8     If you have done really well and there is still money

9 owed, the government may come to the Court and say, look, they

10 can afford to pay more than $100 a month.  All of that will

11 depend on the circumstances.  We'll leave it so.  Either side

12 may come back and seek, the defendant, a reduction, the

13 government, an increase if the circumstances support that.  It

14 would be up to the Court to make that decision at that time.

15     Now, the 100-dollar special assessment you may pay through

16 the Inmate Financial Responsibility Program of the prison

17 facility where you are designated to serve your time.  I will

18 recommend that the Bureau of Prisons consider each of you for a

19 designation as close to the middle part of North Carolina as

20 possible.

21         **MR. DAVIS:**  Your Honor, with respect to Mr. Irick, we

22 would request for a recommendation close to South Carolina.

23         **THE COURT:**  Close to Orangeburg?

24         **MR. DAVIS:**  Yes, sir, Your Honor.

25         **THE COURT:**  Okay.  I will recommend in Mr. Irick's

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

case that he be designated to a facility as close to
Orangeburg, South Carolina, as possible.

It is also recommended that each be allowed to participate
in any educational program, and I will add vocational training
programs.  I encourage each of you to think about an
educational program.  You have had interest in going to
college.  This may be a good opportunity for you to do that;
but any program that you are interested in and qualify to
participate in, I strongly recommend that the Bureau of Prisons
allow you to do that.

I don't know whether the use of the pistol, which is still
considered a firearm in federal law, will prohibit your ability
to participate in substance abuse treatment; but I will
recommend that if you qualify, you be allowed to participate in
the Bureau of Prisons' most intensive substance abuse treatment
program.

As I was reading your presentence reports and reading
about each of you, you really underperformed in high school
academically.  Each of you had used marijuana for some period
of time, according to what you told the probation office.  And
I came along before the prevalence of marijuana.  So I don't
know the effect it has, but I can't help but wonder if using
marijuana didn't affect your academic performance when you were
in school.  Hopefully, you won't be using anything like that
while you are in the Bureau of Prisons.

1    Take advantage of that.  Do whatever you can do to get
2  educational programs.  I mean, if you are interested in
3  vocational training, do that, but pursue the educational
4  programs, too.

5    This may be your opportunity for the engineering,
6  Mr. Byrd, but you've got to apply yourself to do that.  I
7  encourage you to do that.

8    Anything else that you know of that would be helpful to
9  you that I might be able to make a recommendation for?
10  Mr. Shoaf?

11    **MR. SHOAF:**  Your Honor, if I may, his dad said that
12  he had had ADHD and ADD, and I think he said -- my client said
13  that his thinking might have been a little foggy.  Could the
14  Court recommend that he be medically evaluated for any kind of
15  ADHD or emotional --

16    **THE COURT:**  I will.  I will recommend that Mr. Byrd
17  be examined upon entry into the Bureau of Prisons to determine
18  whether or not that may be a problem and whether or not he
19  needs something to help him out with that problem.  He
20  mentioned the difficulty he had taking tests, which some people
21  have, and it is known as test anxiety.  That may be a benefit.

22    Each of you has the right to appeal from the sentence
23  which I just announced.  An appeal has to be filed, the notice
24  of an appeal, within 14 days from the time I sign the written
25  judgment and file that with the Court.  So go ahead and let

1 your attorney know if you would like for that notice to be

2 filed so he can file it within that time after the judgment is

3 filed.

4      Anything further, Mr. Davis, you know of?

5      **MR. DAVIS:**  Yes, Your Honor.  The vehicle, the

6 Pathfinder, it was in the name of his grandfather, who is

7 present.  He's expressed a desire to have that released, along

8 with any personal items.  He indicated that they had purchased

9 a computer for Mr. Irick and some other personal items that

10 might have been in the vehicle.  I would ask that that vehicle

11 be released to the grandfather.

12      **THE COURT:**  Okay.  Mr. Pousson?

13      **MR. POUSSON:**  Your Honor, I don't think we have any

14 objection.  To the extent that there might be personal items

15 inside that might bear on any of the pending other cases, we'd

16 ask if they be allowed to be retained until those cases are

17 resolved; but the vehicle itself, no problem releasing.

18      **THE COURT:**  Then it is ordered that the Pathfinder

19 may be released.  The items in the Pathfinder are evidentiary

20 items perhaps for the state to use in other cases.  So I am not

21 going to order them to be released except, at the conclusion of

22 the period for appeals, they should be turned over to the state

23 if the state is pursuing those charges.  Mr. Pousson, if you

24 are told the state is not pursuing those charges, then they

25 should be released.

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1          **MR. POUSSON:**  Yes, Your Honor.  Thank you.

2          **MR. DAVIS:**  Thank you, Your Honor.

3          **MR. SHOAF:**  Your Honor, my client just told me his

4 wallet was found in the Pathfinder.  So eventually, hopefully,

5 that will be returned to his father.

6          **THE COURT:**  I will make the same finding with the

7 wallet as I just stated with regard to the personal items in

8 Mr. Irick's car.

9          **MR. SHOAF:**  Thank you.

10          **MR. HUGGINS:**  Your Honor, with respect to my client,

11 Mr. Shivers told me that his cell phone and his wallet was in

12 the victim's vehicle.  He would like to get that returned to

13 him as well.

14          **THE COURT:**  I will make the same order with regard to

15 those.  At the conclusion for the period of appeals in this

16 case, if the state is pursuing their cases, they will be turned

17 over to the state for any evidentiary purposes.  If the state

18 has informed the government here that it is not pursuing those

19 matters, then the government will turn them over.

20          **MR. HUGGINS:**  Thank you very much, Your Honor.

21          **THE PROBATION OFFICER:**  Your Honor, probation would

22 like to recommend warrantless search conditions for Mr. Irick

23 and the co-defendants.

24          **THE COURT:**  I considered that and determined in this

25 case not to.

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1     Mr. Pousson, do you know of anything further?

2          **MR. POUSSON:**  Nothing further that I can think of.

3          **THE COURT:**  Let's adjourn until 2:00.

4     (END OF PROCEEDINGS AT 12:24 P.M.)

5

6                         * * * * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014

1  UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6          I,  Briana L. Nesbit, Official Court Reporter,

7  certify that the foregoing transcript is a true and correct

8  transcript of the proceedings in the above-entitled matter.

9

10         Dated this 7th day of July 2014.

11

12

13  _____
    Briana L. Nesbit, RPR
14  Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

USA v. Vendai Irick  -- Sentencing  -- 4/17/2014