```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2

 3  UNITED STATES OF AMERICA,        Criminal Action
                                    No. 1:13CR339-1
 4          Plaintiff,

 5  vs.                             Greensboro, North Carolina
                                    March 6, 2014
 6  VENDAI LAPRIEST IRICK,

 7          Defendant.

 8  _____/

 9

10              TRANSCRIPT OF SENTENCING PROCEEDINGS
            BEFORE THE HONORABLE N. CARLTON TILLEY, JR.
11                SENIOR UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Government:      TIMOTHY N. MATKINS, ESQUIRE
                            Assistant United States Attorney
14                          Post Office Box 1858
                            Greensboro, North Carolina 27402
15

16  For the Defendant:      GREGORY DAVIS, ESQUIRE
                            Assistant Federal Public Defender
17                          301 North Elm Street
                            Suite 410
18                          Greensboro, North Carolina 27401

19
    Court Reporter:         J. Calhoun, RPR
20                          Room 101, U.S. Courthouse Building
                            324 West Market Street
21                          Greensboro, North Carolina 27401
                            (336) 332-6033
22

23

24
              Proceedings reported by stenotype reporter.
25        Transcript produced by computer-aided transcription.
```

**P R O C E E D I N G S**

1

2          (THEREUPON, the following proceedings were had:)

3          THE COURT:  Mr. Matkins.

4          MR. MATKINS:  Yes, Your Honor.  The next matter is

5    United States versus Vendai Lapriest Irick, that's in

6    1:13CR339-1.  Mr. Irick is represented by attorney Greg Davis.

7    The matter is before the Court for sentencing.

8          THE COURT:  Mr. Irick, have you read the presentence

9    report in your case?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  Have you discussed it with Mr. Davis?

12          THE DEFENDANT:  Yes, sir.

13          THE COURT:  Mr. Davis, would you tell me about

14    objections.

15          MR. DAVIS:  Your Honor, we filed an objection to the

16    loss amount that was listed in the report.  That's the only

17    objection.

18          THE COURT:  Okay.  And do you agree with that,

19    Mr. Irick, that that's the only objection there was to matters

20    in the presentence report?

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  Do you have evidence with regard to that,

23    Mr. Matkins?

24          MR. MATKINS:  Yes, sir, Your Honor.

25          THE COURT:  You may proceed.

1    MR. MATKINS:  Government would call Agent Colley to

2  the stand.

3        **(SPECIAL AGENT JAMIE COLLEY, GOVERNMENT'S WITNESS,**

4  **WAS SWORN.)**

5                    **DIRECT EXAMINATION**

6  BY MR. MATKINS:

7  Q.    Would you state your name and occupation.

8  A.    Jamie Colley.  I'm a Special Agent with ATF, Bureau of

9  Alcohol, Tobacco and Firearms.

10  Q.    How long have you been so employed?

11  A.    Twenty-four years.

12  Q.    In law enforcement altogether?

13  A.    Twenty-four.

14  Q.    Are you familiar with the case involving the defendant,

15  Mr. Vendai Irick?

16  A.    Yes.

17  Q.    Did you participate in that investigation?

18  A.    Yes, I did.

19  Q.    Are you familiar with the items stolen from Jared's

20  Jewelry on the date of the offense?

21  A.    Yes, I am.

22  Q.    Were those items recovered?

23  A.    All but one diamond.

24  Q.    Did you receive or obtain from Jared's Jewelry a list of

25  items stolen pursuant to this robbery?

1  A.    Yes, we did.

2  Q.    Did you have an opportunity to take that list from Jared's

3  and reconcile it with the stolen items recovered on the night

4  of the offense?

5  A.    Yes, I did.

6  Q.    If you could, explain what you found.

7  A.    A month ago, I obtained all of the property from the

8  Durham Police Department, the jewelry property.  Most of it was

9  loose diamonds.  They were individually packaged in little

10 plastic bags with -- they still had the ticket on them, the bar

11 code and the price, retail price.  There were a few items of

12 actually jewelry, likes rings and necklaces, but by far, most

13 of it was individual diamonds in a tray, which were stolen out

14 of the store at the time.

15         I took that list provided from Jared's, and

16 reconciled it with all the diamonds that were recovered and

17 everything was there on the list, except for one diamond, which

18 was valid at like $350.

19 Q.    Did you receive a total -- were you able to add up from

20 Jared's list as well as from the price tags on the jewelry

21 recovered, and get a total amount of those items?

22 A.    Yes.

23 Q.    What was the total value of those items?

24 A.    It was well over $400 -- 468,000, I believe it was.  It

25 was everything on the list, the total value, except the one

1 diamond was $350.

2 Q.   Altogether that was in excess of $200,000?

3 A.   Oh, yes.

4 Q.   I apologize.  To back you up a little bit, if you can kind

5 of summarize how the robbery took place and how the jewelry was

6 recovered that night, the night of the offense.

7 A.   Well, what had happened was, the three defendants had

8 previously cased the jewelry store to see what time the manager

9 left in the evening.  On the night in question -- they actually

10 attempted -- one other time they were going to do it, but

11 didn't do the robbery that night.

12          On the night in question, I believe it was June 24th,

13 they observed the manager, Amanda Hill, leave.  She locks up

14 the store.  They followed her in her personal vehicle to her

15 residence in Creedmore, North Carolina.  The store is in

16 Durham.  As soon as she pulls into her driveway, they pull in

17 and block the driveway; two of the subjects, Mr. Shivers and

18 Mr. Byrd get out and approach her.  One goes to the driver

19 before she can get out of the vehicle.  They put a gun to her,

20 point a gun at her, make her move over into the passenger seat.

21 One gets in the back.  One gets in the driver's seat and then

22 they leave to drive back to the jewelry store in Durham, and it

23 is probably 30 minutes away.

24          I don't know if they realized she lived as far away

25 as she did.  They're followed back, of course by Mr. Irick in

his vehicle, which they went to her house in.  All the way
there to the store, they're talking about what they are going
to do, have her keep her hands up.  At one point they stop and
conversed with each other.  Continued on to the store.  They
stop shortly before getting to the store and drop off
Mr. Irick's vehicle, and then he gets in so they are all four,
Ms. Hill and the three defendants in her vehicle and go to the
store.

They have her go and unlock the -- there is a metal
gate that comes down.  They have her raise the gate up about
waist high, not all the way up, unlock the glass door.  They
had talked about the alarm system.  You know, the victim
told -- Ms. Hill told them there is an alarm system, they are
probably going to know that -- she come up with a story that
she forgot her purse or something, if they wouldn't hurt her,
she was trying to assist them so they wouldn't hurt her.

She does go in and turns off the alarm and unlocks
the door, and then they follow her into the store.  She takes
them -- that's where the vault is, so she takes them to the
vault area.  She unlocks the vault, and they start grabbing
mostly the trays of diamonds.  She even told them that on the
way there.  They were asking what they had, how much money is
in the store.  So they're mostly grabbing the big individual
trays, if you will, of individual diamonds.  Like I said, they
do grab some items of necklaces and rings, but it's 90 percent

1  the trays of diamonds.

2        While they're doing that, then they go and get what

3  cash is in the store out of the till.  There is like $1,900,

4  1,600.  It wasn't a lot of cash.  Then they make her go lay

5  down and they leave the store.

6        The defendants then went and got Mr. Irick's vehicle.

7  They previously dropped it off about a mile down the road.

8  While this was going on, there was an individual, a citizen

9  that had just happened to be parked out in the parking lot of

10 the restaurant across the street.  He observed this, thought it

11 was strange, so he had called 911.  So police were actually on

12 their way during this robbery, but they left before the police

13 got there.  So this individual followed them, and was able to

14 call 911 and tell his location.

15       We've now left.  We're on Highway 55.  We've gotten

16 off 40, so the police officers were able to come and zero in on

17 where they were.  At that moment when the police officers got

18 to that location, there was some spinning around in parking

19 lots.  They are now in two vehicles; the victim's vehicle,

20 Ms. Hill's vehicle and the original vehicle.  So they kind of

21 split and go in two separate directions.

22       Some officers chase the victim's vehicle, which

23 eventually wrecks and rolls.  Mr. Shivers was in that vehicle.

24 He's injured and taken into custody.  Mr. Byrd and Mr. Irick

25 were fleeing in two separate directions.  Fled into Cary, where

1  they wreck their vehicle, get out and jump and run.  They were

2  subsequently arrested the next day.

3        Most of the diamonds were in that vehicle still,

4  recovered.  Some were placed in a backpack they took when they

5  ran.  They ran through an apartment complex and hid the

6  backpack that was recovered along the path that they ran.  Most

7  of the diamonds were in the vehicle.  That's how they were

8  recovered.

9  Q.  Are those the same diamonds that you recovered from the

10  Durham Police Department and reconciled with the list from

11  Jared's list of logs?

12  A.  Yes.

13  Q.  Those are diamonds that are valued somewhere around

14  $468,000?

15  A.  That's correct.

16        MR. MATKINS:  I don't have any further questions.

17  Thank you, sir.

18        THE COURT:  Mr. Davis.

19                    **CROSS-EXAMINATION**

20  BY MR. DAVIS:

21  Q.  Agent Colley, when you were reconciling the list provided

22  by Jared's and items recovered, were the diamonds packaged in

23  any way?

24  A.  Yes, they were.

25  Q.  Was that how you were able to reconcile it with the list?

1  A.    Yes.  They each had a little tag, like with a bar code and

2  retail price on them.

3  Q.    And the one item that was not recovered, did you indicate

4  that that was approximately valued at $350?

5  A.    That's correct.  349.99.

6  Q.    Now the events that you describe taking place inside

7  Jared's store, which individuals went in the store with

8  Ms. Hill?

9  A.    I'm not sure.  It was unclear.  I think Mr. Byrd,

10  Mr. Shivers went in.

11  Q.    Do you have any information that at any time, Mr. Irick

12  went into the store?

13  A.    No.  I believe he stayed in the vehicle and drove around,

14  you know, kind of waiting for them to come out.  Didn't want to

15  just sit right in front of the open door.  There was, like I

16  said, the video from the security cameras, and they, too, by

17  the way, saw that this was going on and called 911 themselves,

18  the security company.  They realized it was a robbery going on.

19  Q.    With respect to the trip back from Ms. Hill's home,

20  Mr. Irick was in a separate vehicle from Ms. Hill and the other

21  two defendants?

22  A.    His vehicle following.  They did stop at one point, like I

23  said, and they got out and conversed with each other and were

24  talking on their phones to each other, too, as they were

25  driving back to the store.

1  Q.    Now you indicated that Mr. Irick and Mr. Byrd were

2  arrested the next day.  Did Mr. Irick turn himself in?

3  A.    Yes.

4  Q.    After he surrendered, did he give a statement?

5  A.    Yes.

6  Q.    Did you find his statement to be consistent with other

7  information that the investigation had revealed to that point?

8  A.    Yes.

9         MR. DAVIS:  That's all I have, Your Honor.

10        THE COURT:  Anything further, Mr. Matkins?

11        MR. MATKINS:  No, sir, Your Honor.

12        THE COURT:  Thank you, Agent Colley.

13        Mr. Davis, will there be evidence on Mr. Irick's

14  behalf?

15        MR. DAVIS:  No, Your Honor.

16        THE COURT:  You may be seated, Mr. Irick.

17        MR. DAVIS:  Your Honor, I have filed the objection to

18  the loss amount, because at the time, there hadn't been a

19  reconciliation between the items listed on Jared's list and

20  what was discussed.  I had discussed that with Mr. Pousson this

21  morning when I got here.  I was told that Agent Colley had done

22  that, and we discussed it, but I wanted to make sure that it

23  got on the record that there had been some reconciliation, or

24  attempt to reconcile the items taken with the items recovered,

25  so I don't have anything else on that, Your Honor.

```
 1          THE COURT:  Then I do find that the value of items
 2   taken exceeded $400,000, which is more than 250,000 which
 3   establishes the guideline at the advisory level.
 4          MR. DAVIS:  Your Honor, I had explained to Mr. Irick
 5   that in objecting to the loss amount, that unless we were able
 6   to get it down below that amount, it would not cause any change
 7   in the calculation of his guidelines.
 8          THE COURT:  There are no objections to anything else?
 9          MR. DAVIS:  No, sir.
10          THE COURT:  The government has no objections to
11   anything in the report, Mr. Matkins?
12          MR. MATKINS:  No, sir.
13          THE COURT:  Then I will adopt the report where the
14   total offense level is a 32.  Criminal history category is a
15   one.  The advisory guideline range is 121 to 151 months.
16   Supervised release range, one to three years.  The fine range,
17   75,000 to 175,000.  The amount of restitution would be the
18   $400,000.
19          Do you have a specific figure for that, Mr. Colley?
20          THE WITNESS:  Yes, sir.  Your Honor.  The list
21   totaled $428,623.73, plus 981.74 in cash that was stolen.
22          THE COURT:  So $428,000.
23          Mr. Davis.
24          THE PROBATION OFFICER:  May I approach?
25          THE COURT:  You may.  Mr. Wright brings up a good
```

1  point about the victim's vehicle.

2          Mr. Matkins, we don't have anything from the Durham

3  Police with regard to the damage to their vehicle or from the

4  victim with regard to the value to her vehicle.  Do you have

5  any information about that?

6          MR. MATKINS:  The victim is here today, Your Honor,

7  and I can speak with her.

8          THE COURT:  This would be the time to do it.  You may

9  need to put her on the stand.

10          MR. MATKINS:  I'm sorry.

11          THE COURT:  You may need to put her on the stand.

12          MR. DAVIS:  Your Honor, while he's doing that, may I

13  approach Ms. Winchester?

14          THE COURT:  Of course.

15          MR. MATKINS:  Your Honor, the government would call

16  Amanda Hill.

17          THE COURT:  Please place your left hand on the bible

18  and raise your right.

19          **(AMANDA HILL, GOVERNMENT'S WITNESS, WAS SWORN.)**

20                          **DIRECT EXAMINATION**

21  BY MR. MATKINS:

22  Q.   Ma'am, can you state your name for the Court, please.

23  A.   Amanda Hill.

24          THE COURT:  Would you pull that microphone over a

25  little and then you can sort of sit back and little and relax.

1        THE WITNESS:  Thank you.

2  BY MR. MATKINS:

3  Q.    Ms. Hill, you're familiar with the robbery that occurred

4  on June 24th, 2013, involving the defendant, because you were

5  the victim, is that right?

6  A.    Yes, sir.

7  Q.    Was your vehicle taken?

8  A.    Yes, sir.

9  Q.    What kind of vehicle was it?

10 A.    A 2007 Chevrolet Equinox.

11 Q.    Did you recover the vehicle after the incident?

12 A.    No.  I mean, I got money from the insurance company, but

13 my husband and I got to see where it was totaled and tried to

14 get any personal belongings out at about 3 o'clock in the

15 morning on June 25th, but after that, I've never seen it again.

16 Q.    You actually went out to where the vehicle was wrecked?

17 A.    Yes, sir.

18 Q.    And essentially it was totally destroyed?

19 A.    It was unrecognizable.

20 Q.    Do you know what the value of the vehicle was?

21 A.    I know the insurance company gave me about $11,000.

22 Q.    And how much did it cost you out-of-pocket?  Did you have

23 to pay your insurance?

24 A.    I had a 50-dollar deductible and of course I had to

25 purchase a new car.

1  Q.   And what was the value of the new vehicle you purchased?

2  A.   $23,000.

3  Q.   Now was the Equinox, was that paid in full or did you

4  still owe money on it?

5  A.   I still owed money on it.

6  Q.   Do you remember how much?

7  A.   About $6,500, so they --

8            THE COURT:  Who paid that?

9            THE WITNESS:  The insurance company gave about $6,500

10  to the bank and then the balance to my husband and myself to

11  put towards the new vehicle.

12            MR. MATKINS:  I don't have any further questions

13  regarding value of the vehicle.

14            THE COURT:  Mr. Davis.

15                    **CROSS-EXAMINATION**

16  BY MR. DAVIS:

17  Q.   Ms. Hill, are you saying that you received a total of

18  $17,500 for the car?

19  A.   No.  I received 11,000.  About 6,500 of it went to the

20  bank and then the rest, equaling into the 11,000 went to my

21  husband and me.

22  Q.   So you were are subtracting 6,500 from the 11,000?

23  A.   Yes, sir.

24            MR. DAVIS:  That's all I have, Your Honor.

25            THE COURT:  Who is your insurance company?

1    THE WITNESS:  GEICO.

2    THE COURT:  Anything further?

3    MR. MATKINS:  No, sir, Your Honor.

4    MR. DAVIS:  No, Your Honor.

5    THE COURT:  Thank you, Ms. Hill.

6    MR. MATKINS:  Ms. Hill has prepared a statement.

7    THE COURT:  Sure.  Would you like to read that?

8    THE WITNESS:  In regards to how this incident has

9    affected me, I used to be the type of person who likes to sing

10   and dance at the top of my lungs to the radio while I'm in the

11   car.  Since June 24th, I don't do that anymore.  While I'm in

12   the car, I'm constantly looking out the window to make sure

13   nobody is coming up.  I constantly check the back seat, whether

14   I'm the driver or the passenger, to make sure nobody is there,

15   to make sure that I'm alone and safe.

16   When I notice a car has been behind me for more than

17   a couple of minutes, I change lanes, take an exit, take a

18   random turn down a street, just to make sure that they

19   eventually go away and I'm not being followed.

20   Once I get close to my house, I have to give myself a

21   pep talk before I can get even turn into the drive-way.  Making

22   sure there are not other vehicles around me, even though I live

23   in a neighborhood.  I can't turn on my street if there is a car

24   behind me.

25   Once I feel safe, I approach my house, but I won't go

home at night unless my husband is already there, has the light
on and is waiting for me or if he's in the vehicle with me.

In general, I feel like I'm a very accepting person
that believes the best in people.  When I noticed I was being
followed the night that it happened, I was hoping that maybe
they needed directions because we lived so far out in the
country, and obviously that wasn't the case.

Since June 24th, when I'm dealing with people, I have
to constantly remind myself that, you know, the person I'm
dealing with is not a threat to me, they are not trying to hurt
me.  With me being in the retail profession, I deal with
strangers every day.  My fear makes my ability to interact with
guests and my employees difficult.  I try to be friendly,
outgoing and communicate without giving off the panic that I
sometimes feel, but I don't know if I always succeed with that.

On June 24th, I went to work.  I had a good day and
congratulated my employees on their hard work and was laughing
and joking as I locked the gate to the store and then we left
for the evening.  I drove home happy.  I was singing and
dancing in the car just being carefree.

I pulled into my driveway, and everything changed.
At gunpoint, I was forced in the passenger seat and was driven
away from my home and husband.  They threatened me.  They told
me they had someone watching my house and my family and I would
be hurt if I didn't help them steal from my company.  Because

of what they said, I was scared I was going to die.  I

understand that the three men are young, and I am grateful to

them for not physically hurting me, however, the emotional

damage is still with me every day.

I hope that one day they can have families and be

contributing members of society, however, I hope this day is

very far in the future, because I'm still not okay, and I don't

know when I will be.  I was a happy person and then they stole

me out of my driveway and forced me to help them steal from my

store and took my vehicle from me and totaled it.  They stole

my feeling of safety in the two locations where I spend pretty

much all of my time.  I've yet to get that feeling of safety

back.  That's all I had.

THE COURT:  Are you seeing someone, a psychologist or

psychiatrist?

THE WITNESS:  No.  My company I work with has an

employee assistance hotline and I've spoken to one of them a

few times and I've been to see my regular physician, but I have

not been to see someone regularly.

THE COURT:  I think it would be a wise thing to do

that.

THE WITNESS:  Probably.

THE COURT:  I encourage you to do that.  You know,

people need to do that, not because there is something wrong

with them, because things happen in life that would have an

effect on anyone that those things happened to, and people need

assistance in realizing how to overcome that, how you overcome

those fears that you described.  I strongly encourage you to do

that.

         Anybody have anything?

         MR. MATKINS:  Can I ask one question?  I'm not trying

to pry.  How old are you?

         THE WITNESS:  I am 28.  I was 27 when it happened.

         MR. MATKINS:  Thank you.

         THE COURT:  Mr. Davis.

         MR. DAVIS:  No, Your Honor.

         THE COURT:  Thank you, Ms. Hill.

         MR. MATKINS:  May I have just a moment, Your Honor?

         THE COURT:  You may.

         With regard to the question of restitution, it

appears from the evidence, that GEICO, would be entitled to

restitution.  I know of nothing that would entitle Ms. Hill or

her husband to reimbursement beyond that amount.  I mean, there

is no evidence that would support that.

         I'll be glad to hear from you if you think otherwise.

         MR. MATKINS:  Only the 50-dollar deductible that was

actually out-of-pocket, but, yes, sir, I think GEICO would be

appropriate.

         THE COURT:  Mr. Davis.

         MR. DAVIS:  I would agree, Your Honor.

1          THE COURT:  I do think the 50-dollar deductible

2   certainly is appropriate.  So $11,050, with 11,000 being

3   earmarked for GEICO and $50 for Ms. Hill, as well as $428,000

4   to the jewelry store.

5          Mr. Davis, I'll be glad to hear from you.  I have, of

6   course, read your position paper.

7          MR. DAVIS:  Yes, sir.

8          THE COURT:  And maybe you're not the person I should

9   be asking this question of, but in this case, and in the

10  companion case, I notice in the criminal history, that there

11  are pending charges in Wake County for felony robberies alleged

12  to have occurred on June the 2nd, and they are different case

13  numbers for those.

14         Can you help me anything about that?

15         MR. DAVIS:  Your Honor, since --

16         THE COURT:  Maybe I should be asking the government

17  about that.

18         MR. DAVIS:  That might would be better, Your Honor,

19  since the charges are still pending.

20         THE COURT:  Let me do that.

21         Mr. Matkins.

22         MR. MATKINS:  Your Honor, my understanding, this is

23  separate -- a completely separate offense, a robbery of a

24  McDonald's in Raleigh, otherwise unrelated to this matter

25  before the Court.

1          THE COURT:  Okay.

2          MR. MATKINS:  I'm sorry, it was in Cary, not Raleigh.

3          MR. DAVIS:  Your Honor, when I'm dealing with a

4    situation like this, it always astounds me how somebody who is

5    so young, has not been in trouble before, all of a sudden gets

6    involved in something as serious as this was.

7          THE COURT:  Let me ask you if -- certainly your

8    argument in mitigation in the position paper would be effected

9    by whatever may or may not have been done in those charges from

10   Cary.

11         Would it not be appropriate for the Court to find out

12   more about that to determine the argument and what

13   consideration should be given?

14         MR. DAVIS:  It might would be helpful, Your Honor.

15   It might would be.  As I said, there is not too much I can say

16   about that, since the charges are pending.  I had intended to

17   have some conversation with Mr. Pousson this morning about

18   those matters, but unfortunately, he's tied up, so that

19   conversation will have to take place later.

20         THE COURT:  He is involved in a case before Judge

21   Osteen on the third floor?

22         MR. DAVIS:  Yes, sir.

23         THE COURT:  Let me suggest this.  Unless the jury is

24   back asking a question, he should be available, and what I want

25   you to do, Mr. Shoaf, Mr. Huggins, is to go and talk to him now

with Mr. Wright and Mr. Matkins.  I think the Court should be
aware of what is involved there.  Maybe hear evidence about it,
to determine exactly what should be done or whether it should
be considered at all, not considered at all, what if any
effect, if it is considered, it would have on a possible
sentence.

      Let's take a recess here and you folks go see if you
can talk to Mr. Pousson.  Let us know when you finish.

      (Recess taken.)

      THE COURT:  Tell me where you are.

      MR. MATKINS:  Your Honor, we looked into those
charges in Wake County a little more.  Det. Jim Young with Cary
Police Department -- agent Colley said he is available, putting
his file together and he can be here, I guess in a hour, hour
and a half from Raleigh, if you want to hear additional
information from him.

      THE COURT:  I think we need to.

      MR. MATKINS:  Okay.

      MR. DAVIS:  Your Honor, before we do that, could we
approach the bench?

      THE COURT:  Sure.

      (Bench conference on the record.)

      MR. DAVIS:  I'm not sure how much information the
Court wants.  During the recess, I did point out something that
was in the discovery in this case that relates to those other

two robberies.  There was a statement that my client had gave,
and I highlighted and showed it to the U.S. Attorney and I
don't know whether that would be sufficient for --

THE COURT:  You know, I don't think we can finish
this today, because I think each defendant is entitled to,
since there was no real notice of this, I think everybody is
entitled to have this opportunity to know that this is
something that needs to be addressed.  Let's have him come at
another time.

MR. DAVIS:  Yes, sir.

(Bench conference was concluded.)

THE COURT:  What we were discussing was logistics of
going forward today with this.  Even though the officer could
come, it would place the defendants in a situation of hearing
evidence and not having time to prepare to meet whatever that
is if they had to go forward with sentencing, so I think we're
going to have to find another day and let that officer come and
give people notice of what that testimony is likely going to
be, so everybody can be prepared to address that in advance.

Mr. Shoaf, Mr. Huggins, I know Mr. Huggins is not
opposed to continuing the matter to another time.  Mr. Shoaf,
you have not moved to continue to a later time.

MR. SHOAF:  No, Your Honor.  I have no objection to
it.

THE COURT:  Okay.  Do you have a possibility at this

1  time, Ms. Winchester?

2         April the 17th at 9:30.  Does that work?

3         MR. HUGGINS:  Yes, Your Honor.

4         MR. DAVIS:  Your Honor, may I check my calendar?

5         THE COURT:  Absolutely.  Please do.  Mr. Shoaf, does

6  that work for you?

7         MR. SHOAF:  Yes, Your Honor.

8         MR. DAVIS:  That's fine, Your Honor.

9         THE COURT:  Then we will just continue these matters

10 to April the 17th at 9:30.  Mr. Huggins, would you wait just a

11 few moments and let me speak with you about a matter, not

12 relating to the substance of your case.

13        MR. HUGGINS:  Yes, sir.

14        (Recess taken.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3          I, J. CALHOUN, RPR, United States District Court

 4   Reporter for the Middle District of North Carolina, DO HEREBY

 5   CERTIFY

 6

 7          That the foregoing is a true and correct transcript of

 8   the proceedings had in the within-entitled action; that  I

 9   reported the same to typewriting through the use of

10   Computer-Aided Transcription.

11          THIS TRANSCRIPT CERTIFICATION IS VOID, IF THE

12   SIGNATURE IS NOT ORIGINALLY SIGNED BY THE COURT

13   REPORTER WHO REPORTED THIS MATTER.

14

15

16

17

18

19   Date:   7-14-14          J. Calhoun, RPR.
                              United States Court Reporter
20                            324 W. Market Street
                              Greensboro, NC  27401
21

22

23

24

25
```

